[No. B078619. Second Dist., Div. Three. Apr. 25, 1995.]

EDWARD GARDNER et al., Plaintiffs and Appellants, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

Counsel

Richard A. Rothschild, Robert D. Newman, Clare Pastore, Katherine E. Meiss, Paul Tepper, Lewis Hollman, Esther Epstein, Tim Whisman, Mark Rosenbaum, Nancy Minte, Stacy Chapnab and Patrick Dunlevy for Plaintiffs and Appellants.

Catherine I. Hanson, Astrid G. Meghrigian and Lois Richardson as Amici Curiae on behalf of Plaintiffs and Appellants.

De Witt W. Clinton, County Counsel, Roberta M. Fesler, Assistant County Counsel, Steven J. Carnevale and Patrick A. Wu, Principal Deputy County Counsel, and Ada Treiger, Deputy County Counsel, for Defendants and Respondents.

Opinion

CROSKEY, Acting P. J.—The plaintiffs, a class of indigent residents of Los Angeles County (the County) who receive aid through the County's general assistance (GA) program, appeal from denial of a preliminary injunction. This class action lawsuit[1] for declaratory and injunctive relief and a petition for writ of mandate was filed in response to a plan by the County to reduce its general relief cash grants from $293 to $212 per person per month. The latter figure was calculated by deeming health care in County medical facilities to be "in-kind aid," and by crediting a portion of its cost against the County's obligation under Welfare and Institutions Code section 17000 to provide general assistance to the indigent.[2] The County contends it is authorized by Welfare and Institutions Code section 17000.5 to do this.[3]

We are compelled to disagree. Section 17000.5 allows only the value of in-kind *aid* to be credited against a county's obligations under that section.

---

[1]The named plaintiffs requested certification of the action as a class action. The record contains no formal action by the court on the request. However, the record does contain three temporary restraining orders which were issued for the benefit of persons other than the named plaintiffs. Indeed, the third was issued for the benefit of some 150 listed individuals. This circumstance and the additional circumstance that each was captioned "class action" indicates the action did proceed as a class action, as requested by the named plaintiffs.

[2]Unless otherwise noted, further statutory references are to the Welfare and Institutions Code. Section 17000 provides: "Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions."

[3]Section 17000.5 provides in pertinent part as follows: "(a) The board of supervisors in any county may adopt a general assistance standard of aid, including the value of in-kind aid, that

Based upon the record before us, and upon the law which has been brought to our attention by the parties and through our independent research, we conclude that "aid," as used in the statute, does not include medical care. We therefore reverse the trial court's order denying the preliminary injunction and direct that the preliminary injunction be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Background.*

In the fiscal years of 1992 through 1994, the County suffered ongoing funding crises, requiring cuts in the levels of numerous public services, including sheriff and fire services, welfare, the courts, children's services, the district attorney and the public defender, probation services, the coroner, beaches, harbors, libraries and parks.

Because GA is an unfunded state mandate, the County estimated that a quarter of its property tax revenues would be consumed by GA if pre-1993 grant levels were maintained. Of greater concern, the County found itself unable to meet its financial requirements in order to obtain state matching funds for its health care programs.[4] In order to meet these requirements, the County initiated its program of deeming the health care it provided to GA recipients to be in-kind aid, deductible from GA cash grants.

The County's legal authority to deduct health care costs in this manner is limited by the applicable provisions of the Welfare and Institutions Code. Section 17000 requires every county in the state to "relieve and support" the poor. In furtherance of this duty, section 17001 requires counties to adopt "standards of aid and care" for the indigent and dependent poor.[5] Section 17000.5, which was enacted as an emergency measure on June 30, 1991 (Stats. 1991, ch. 91 (Assem. Bill No. 948), §§ 34, 42), overrules previous

---

is 62 percent of a guideline that is equal to the 1991 federal official poverty line and may annually adjust that guideline in an amount equal to any adjustment provided under Chapter 2 (commencing with Section 11200) of Part 3 for establishing a maximum aid level in the county. ¶(b) The adoption of a standard of aid pursuant to this section shall constitute a sufficient standard of aid."

[4] The financial requirements involved are the County's maintenance of effort obligations, required to obtain funds from the account established under the California Healthcare for Indigents Program (CHIP; see ch. 5, commencing with § 16940, of pt. 4.7 of div. 9.) In order to receive funds from the CHIP account, section 16990 requires counties to maintain specified levels of local funding for indigent health care programs. See further discussion in part 3(c)(2) of the Discussion, beginning at page 218, *post.*

[5] Section 17001 provides: "The board of supervisors of each county, or the agency authorized by county charter, shall adopt standards of aid and care for the indigent and dependent poor of the county or city and county."

judicial authority which required the standard of aid to be based upon a specific factual study of actual subsistence costs of living in each county (see, e.g., *Whitfield* v. *Board of Supervisors* (1991) 227 Cal.App.3d 451, 460 [277 Cal.Rptr. 815]; *Boehm* v. *Superior Court* (1986) 178 Cal.App.3d 494, 501-502 [223 Cal.Rptr. 716]), and authorizes counties to adopt a "general assistance standard of aid" equal to 62 percent of the 1991 federal official poverty line. (*Oberlander* v. *County of Contra Costa* (1992) 11 Cal.App.4th 535, 542 [15 Cal.Rptr.2d 182].) As amended by emergency measures in September of 1992 (Stats. 1992, ch. 719 (Assem. Bill No. 1012), §§ 14 and 17) Stats. 1992, ch. 721 (Assem. Bill No. 2883) §§ 1 and 3; Stats. 1992, ch. 722 (Sen. Bill No. 485), §§ 139 and 154), section 17000.5 also expressly authorizes counties to satisfy part of their GA obligation through in-kind aid.

During the 1991-1992 fiscal year (commencing July 1, 1991, and ending June 30, 1992), the County's GA grant was governed by the terms of a stipulated judgment entered in a lawsuit, Mendly v. County of Los Angeles (Super. Ct. L.A. County, 1991, No. BC 017558). The case was filed in December of 1989 by a class of GA recipients. The stipulated judgment, entered on June 11, 1991, approximately three weeks before the enactment of section 17000.5, established grant levels for a period of five years.

Under the terms of the stipulated judgment, the GA cash grant was $341 per person per month, plus an annual clothing allowance of $111. In September of 1992, the Legislature enacted an uncodified emergency measure which nullified all stipulated judgments like the one entered in Mendly, *supra*, No. BC 017558. (Stats. 1992, ch. 721 (Assem. Bill No. 2883), § 2.)[6] Accordingly, as of July 1, 1993, under the formula established in section 17000.5, the County was entitled to cap its general relief payment at $285, plus a monthly clothing allowance of $9. This cap was put into effect in September of 1993.

However, the County found this reduction in its GA obligation inadequate to meet its fiscal crisis. The County then acted to credit its health care services to the indigent against its GA obligation and thereby reduce the cash

---

[6]Chapter 721 also included a provision which amended section 17000.5 in exactly the same manner as it was amended by chapter 719, except that chapter 719 included subdivision (c) of section 17000.5 as it was originally enacted. That subdivision provided that "nothing in [the] section [was] intended to abrogate existing settlements." (Stats. 1991, ch. 91 (Assem. Bill No. 948), § 34.) Chapter 721 and chapter 722, a third statute which amended section 17000.5, deleted that subdivision. Chapters 719, 721 and 722 (Sen. Bill No. 485) were all signed into law by the Governor on the same day, September 14, 1992. Thus, chapters 721 and 722 prevail over chapter 719 where their provisions differ. (Gov. Code, § 9605.) In March of 1994, chapter 721 (Assem. Bill No. 2883) was held to be constitutional. (*Mendly* v. *County of Los Angeles* (1994) 23 Cal.App.4th 1193, 1211-1212 [28 Cal.Rptr.2d 822].)

grants to $212. Under the County's plan, which has now presumably been put into effect, health care is characterized as in-kind aid. It is deemed to be provided through membership in the County's Community Health Plan (CHP) in which all GA recipients are automatically enrolled. The value of participation in the plan, which the County has set at $73 per month, is applied toward the County's obligation under section 17000.5, and is accordingly deducted from the amount paid as a cash grant.

## 2. *Proceedings in the Trial Court*

The named plaintiffs, Edward Gardner, Martin Figueroa, Terry Akison, Kelly McConnell, Raymond Johnson and Patricia Thornton, represent the class of poor residents of the County who receive assistance through the County's GA program (hereafter, plaintiffs). They filed a complaint for declaratory and injunctive relief and a petition for writ of mandamus in August of 1993 in an effort to prevent the County from reducing their cash grants, as planned, to $212 per month.

The grant reductions were scheduled to take effect on September 1, 1993. On August 13, 1993, the plaintiffs moved for a preliminary injunction which would prohibit the County from implementing the reductions. After a hearing held on September 7, 1993, the court denied the motion, finding denial was required by *Oberlander* v. *County of Contra Costa, supra,* 11 Cal.App.4th 535 (hereafter, *Oberlander*).[7]

## CONTENTIONS

Plaintiffs contend that "aid," within the meaning of section 17000.5 does not include medical care; thus free medical care provided by a county cannot be deemed "in-kind aid," and its costs cannot be deducted from GA cash grants under that section.

## DISCUSSION

## 1. *Principles Governing Review.*

Trial courts consider two interrelated questions in deciding whether or not to issue a preliminary injunction: (1) are the plaintiffs likely to suffer greater injury from a denial of the injunction than the defendants are likely

---

[7]The trial judge stated she believed *Oberlander* was wrongly decided, but nevertheless believed she was compelled to follow it. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

to suffer from its grant? (2) is there a reasonable probability that the plaintiffs will prevail on the merits? (*Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 206 [211 Cal.Rptr. 398, 695 P.2d 695].)

The decision to grant or deny a preliminary injunction generally rests in the sound discretion of the trial court. (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69 [196 Cal.Rptr. 715, 672 P.2d 121].) However, in this case, the trial court ruled that the balance of harms favors the plaintiffs and denied the preliminary injunction only because it believed section 17000.5, as construed in *Oberlander*, *supra*, required that result. The correctness of the court's order thus depends entirely upon the proper construction and application to be given section 17000.5. On that matter we exercise independent judgment. (*Tobin* v. *Oris* (1992) 3 Cal.App.4th 814, 825 [4 Cal.Rptr.2d 736].)

### 2. Balance of Harms

The trial court found that the balance of harms favored the plaintiffs in this matter. This finding was plainly within the trial court's discretion, where the plaintiffs' declarations establish that many will be—and presumably by now have been—rendered homeless by the cuts in cash grants which reduced the income of many residents *below* their monthly rent, and which the County insists it is authorized to make. Thus, plaintiffs clearly have satisfied the first requirement for a preliminary injunction.

### 3. Likelihood of Succeeding on the Merits.

However, the second hurdle over which plaintiffs must climb in order to justify their request for a preliminary injunction is far more complicated. The critical question is whether health care is properly included as a part of the general assistance standard of aid as the County contends. We address this issue by first considering the trial court's misplaced reliance on the *Oberlander* decision; we then discuss the historical circumstances which demonstrate that health care and the GA grant program have been separately treated by both case law and statutory provisions; finally, we review the extent to which the County itself has consistently administered health care separate and apart from GA grants. We conclude that, on the record before us, such separate treatment in both law and practice precludes the County's current effort to now satisfy its health care burden by charging it against its statutorily capped aid obligation under section 17000.5.

### a. The County's Reliance Upon the Oberlander Decision Is Misplaced.

The trial court concluded it was bound by the decision of the Court of Appeal in *Oberlander*, *supra*, 11 Cal.App.4th 535, to find that medical

care provided by counties free of charge to GA recipients is "in-kind aid" within the meaning of section 17000.5 and is therefore deductible under that section from amounts paid as GA cash grants. We disagree. We do not believe either the direct holding or the reasoning of *Oberlander* has any application to medical care.

*Oberlander* involved appeals by both parties from a judgment granting in part and denying in part a petition for a writ of mandate filed by the GA recipient plaintiffs after the defendant Contra Costa County adopted certain resolutions in response to the enactment of section 17000.5. By the first of those resolutions (Res. No. 91/606), the defendant established a GA standard at 62 percent of the poverty line, as authorized by section 17000.5. Included in that resolution was a provision for the deduction of $10 per day from a recipient's cash grant if he or she resided in a public or private shelter or was ejected from a shelter for failure to follow shelter rules. By the second resolution (Res. No. 91/607), the defendant "adopted what it characterized as a discretionary program for meeting the special needs of those eligible for general assistance. Special need allowances were provided for costs incident to a job search or to taking a job (union dues or uniforms), costs caused by health problems (special diets, eyeglasses, etc.), costs for clothing and a supplement for individuals living in board and care homes." (*Oberlander*, *supra*, 11 Cal.App.4th at p. 540.)

The *Oberlander* decision includes three separate holdings with respect to the application of section 17000.5: (1) section 17000.5 legislatively over-ruled a line of judicial authority, beginning with *Boehm* v. *County of Merced* (1963) 163 Cal.App.3d 447 [209 Cal.Rptr. 530], which required a county's GA level to be based upon a factual study of the costs of basic subsistence in the county (*Oberlander*, *supra*, 11 Cal.App.4th at p. 541); (2) section 17000.5 authorizes counties to include in the GA standard the value of in-kind aid, including in-kind aid provided by noncounty or unspecified "nonsection 17000.5" programs, and to deduct the equivalent of that value from cash grants (11 Cal.App.4th at pp. 545-546); and (3) the GA standard which is authorized by section 17000.5 fulfills a county's total GA obligation and includes both monthly flat grants and "special needs" grants. (11 Cal.App.4th at p. 548.)[8]

The County contends it follows from the above holdings that medical care, which is provided in kind at county medical facilities, can also be credited

---

[8]*Oberlander* also construed section 17001.5, which then provided that a county was authorized to establish a reduced GA standard for recipients who shared housing with one or more unrelated persons or with one or more persons who were not legally responsible for the applicant or recipient (§ 17001.5, subd. (a)(2)(A)), and also provided that counties with shared housing reductions larger than the amounts specified in subdivision (a)(2)(A) were authorized to continue applying those reductions (§ 17001.5, subd. (a)(2)(C); Stats. 1992,

against the County's GA obligation. The County's argument, in essence, is as follows: (1) a County may fulfill part of its GA obligation by providing in-kind benefits, the value of which can be deducted from the GA cash grant; (2) the GA standard authorized by section 17000.5 fulfills a county's total GA obligation, including any allowance for special needs; (3) medical care is an in-kind benefit indistinguishable from other special needs; therefore, (4) its value is included in the GA standard and can be deducted from the GA cash grant. However, this argument begs the question of whether medical care is indeed a benefit included within the "general assistance standard of aid." The County's argument is correct only if it is so included. *Oberlander* simply did not consider or discuss the question of whether or not this is the case.

The plaintiffs correctly argue that medical care was not among the "special needs" at issue in *Oberlander*. The only needs at issue were those affected by the Contra Costa County Resolution No. 91/607, that is: (1) costs incident to a job search or taking a job (union dues or uniforms), (2) clothing costs, (3) a supplement for persons living in board and care homes, and (4) costs incident to health problems, such as special diets or eyeglasses, *but not the actual cost of medical treatment.* (*Oberlander, supra,* 11 Cal.App.4th at p. 540.) A declaration by counsel for the *Oberlander* plaintiffs, which is attached to the plaintiffs' motion for preliminary injunction in this case, and which the County does not here contradict, establishes that medical care was not affected by either of the resolutions that were challenged in *Oberlander*. Contra Costa County did not at any time contend it could characterize medical care as in-kind "aid" under the statute, or that it could deduct medical care costs from its GA obligation, although it successfully argued that it could provide *housing* in-kind and deduct its cost from the GA cash grant, as provided in Resolution No. 91/606 (*Oberlander, supra,* 11 Cal.App.4th at pp. 545-546), and that certain "special needs" were included in the basic section 17000.5 grant. (11 Cal.App.4th at p. 548.)

The plaintiffs in *Oberlander* contended that, for two reasons, aid which was provided for the special needs affected by Resolution No. 91/607 could not be considered as part of a recipient's total monthly grant. First, the plaintiffs argued that the Legislature intended to tie GA benefits to the dollar

ch. 719, § 14). The *Oberlander* court held that (1) the effect of section 17001.5 was to permit a county to reduce by the specified percentages the GA paid to adults who share housing (11 Cal.App.4th at pp. 542-543), and (2) the "grandfather" clause for counties which previously had greater shared housing reductions applied only where such reductions were valid under former law and were *actually in effect* before section 17001.5 was enacted. By a subsequent amendment to section 17001.5, the above provisions have been deleted. (Stats. 1994, ch. 952, § 1.)

levels of Aid to Families With Dependent Children (AFDC) benefits, and special needs grants are expressly made add-ons to the basic monthly AFDC grant. Thus, they argued the same should be true of GA grants. (11 Cal.App.4th at p. 547.) The Court of Appeal rejected this argument. The fact that the Legislature distinguished between flat monthly grants and special needs grants in the statutes governing AFDC demonstrated that it knew how to make such a distinction where it wished to do so. Thus, the court held that, by *not* distinguishing between the flat monthly GA grant and special needs grants when setting the GA standard in section 17000.5, the Legislature signaled an intent to subsume all needs within the single basic grant. (11 Cal.App.4th at pp. 547-548.)

The *Oberlander* plaintiffs next argued that the Legislature did not intend to encompass special needs within the basic GA grant under section 17000.5, because special needs were traditionally not met by the flat monthly GA grant. Rather, special needs grants were provided separately, as is medical care, which is provided through county health services departments at county hospitals. (11 Cal.App.4th at p. 548.) The court rejected this argument without substantial analysis. The court observed only that *Poverty Resistance Center* v. *Hart* (1989) 213 Cal.App.3d 295 [261 Cal.Rptr. 545], which the plaintiffs cited in support of their argument, was inapposite, as indeed it was. *Poverty Resistance Center* held, among other things, that in setting a GA standard under the law that applied before section 17000.5 was enacted, a county was not free to ignore special needs that are not common to all recipients. (213 Cal.App.3d at pp. 308-309.) *Oberlander* concerned a very different question. It concluded that section 17000.5 eliminated the entire requirement of needs studies, as long as a GA standard equal to 62 percent of the poverty line was adopted. (*Oberlander, supra,* 11 Cal.App.4th at p. 548.)

The County asserts that medical care was affected by *Oberlander*'s holding. In making this argument it substantially relies upon the language used by the *Oberlander* court in describing the plaintiffs' second argument on the question of special needs: "Plaintiffs insist that special needs, *like health care provided through county hospitals*, have traditionally been met not by the flat monthly general assistance grant." (11 Cal.App.4th at p. 548.) The County reads that sentence to mean that special needs, *such as* medical care, were at issue in the case.[9] However, the full text of the *Oberlander* decision, together with its factual context, demonstrates the court could have only meant that the *plaintiffs* were contending that the special needs affected by

---

[9] Indeed, the County misquotes *Oberlander*'s language at one point in its brief, arguing that "As demonstrated by the language, 'such as health care provided through county hospitals,' the Court specifically had health care in mind when it interpreted section 17000.5."

the challenged resolution (job search costs, union dues, work uniforms, clothing costs, board and care costs, special diets, eyeglasses) were traditionally not considered part of the flat monthly grant, *and in this respect, the special needs at issue resembled medical care.*

As we have observed, the *Oberlander* court rejected this argument. However, the issue of whether or not medical care, like the special needs affected by Contra Costa County Resolution No. 91/607, can be set off against a county's GA obligation was never before the court in *Oberlander*. Hence *Oberlander* is not authority for the proposition that such a set-off is proper. (*Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1157 [278 Cal.Rptr. 614, 805 P.2d 873]; *Poverty Resistance Center* v. *Hart, supra,* 213 Cal.App.3d at p. 303.)

Moreover, medical care for the indigent is different in several respects from the "special needs" which were at issue in *Oberlander*. For example, medical care is provided at county medical facilities by county health departments, a separate agency from the agency—a county's department of public social service—that is responsible for GA. In addition, unlike GA, which is funded entirely by each separate county, medical care for the indigent is funded in part by the California Healthcare for the Indigent Program (CHIP). It was not contended by the plaintiffs in *Oberlander*, and it is not contended by either party here, that "special needs" supplements have ever been supplied through any agency, or from any funding source, that is separate from the agency and funding source which provides the basic GA grant. Given these differences, the reasoning upon which the *Oberlander* court relied in finding that "special needs" are covered by the basic monthly GA grant under section 17000.5 does not necessarily apply to medical care.

Thus, to evaluate the County's claims respecting medical care, we may not rely upon *Oberlander*; we must instead construe the statute as it applies to the specific matter before us. The statute must be construed (1) in the light of the decisional background against which the Legislature acted (*People* v. *Norris* (1985) 40 Cal.3d 51, 54-55 [219 Cal.Rptr. 7, 706 P.2d 1141]; *People* v. *Dixon* (1979) 24 Cal.3d 43, 51 [154 Cal.Rptr. 236, 592 P.2d 752]), (2) the overall statutory system of which the particular statute is a part (*In re Michael G.* (1988) 44 Cal.3d 283, 296 [243 Cal.Rptr. 224, 747 P.2d 1152]), and (3) the factual and historical background out of which the statutes and

the judicial decisions arose. (*H.S. Mann Corp.* v. *Moody* (1956) 144 Cal.App.2d 310, 320 [301 P.2d 28].)[10]

   b.   *Case Law Has Never Required Health Care to Be Included in the GA Standard of Aid.*

The courts have always acknowledged that counties can meet some of their obligations under section 17000 by furnishing in-kind benefits. (*Robbins* v. *Superior Court, supra*, 38 Cal.3d at p. 210; *Patten* v. *County of San Diego* (1951) 106 Cal.App.2d 467, 470 [235 P.2d 217].) And section 17000.5 now expressly so provides. (*Bell* v. *Board of Supervisors* (1994) 23 Cal.App.4th 1695, 1707 [28 Cal.Rptr.2d 919]; *Oberlander, supra*, 11 Cal.App.4th at pp. 545-546.) However, the issue in this appeal is whether medical care that is provided through County medical facilities is among the in-kind benefits which are included in County's GA obligation under section 17000.5.

Before the enactment of section 17000.5, a county's obligation to establish standards for "aid and care" was set forth in general terms in section 17001 (see fn. 5, *ante*), which simply mandated that the board of supervisors or another agency authorized by the county charter should adopt such standards. County supervisors had broad discretion to determine eligibility, the type and amount of aid, and the conditions to be attached to indigent relief, but such discretion was to be exercised within the boundaries defined by the general purposes of the statutes governing public assistance. (§ 11000; *Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 679 [94 Cal.Rptr. 279, 483 P.2d 1231].) A line of judicial authority beginning with *Boehm* v. *Merced County, supra*, 163 Cal.App.3d 447 (hereafter, *Boehm I*) construed section 17001 to require the GA grant level to be based upon a study of the costs of actual subsistence needs in each county. (*Whitfield* v. *Board of Supervisors, supra*, 227 Cal.App.3d at pp. 456-457; *Guidotti* v. *County of Yolo* (1989) 214 Cal.App.3d 1552, 1561-1563 [271 Cal.Rptr. 858]; *Poverty Resistance Center* v. *Hart, supra*, 213 Cal.App.3d at pp. 304-305; *Boehm* v. *Superior Court, supra*, 178 Cal.App.3d at p. 502 (hereafter, *Boehm II*); *Boehm I, supra*, 163 Cal.App.3d at pp. 451-452.)

■   The County contends medical care is included in the GA standard under section 17000.5 because it is not expressly *excluded*, and because it was historically required by the *Boehm* line of cases to be included in the GA

---

[10]For an interesting discussion and overview of the historical background of general relief, see the comments of Justice Johnson in his dissenting opinion in *Mendly* v. *County of Los Angeles, supra*, 23 Cal.App.4th 1193, 1213-1215 (dis. opn. of Johnson, J.).

standard required by section 17001. The County contends that when the *Boehm* line of cases was effectively repealed by the enactment of section 17000.5, the Legislature presumably intended the GA standard established by section 17000.5 to address the same needs as the *Boehm* standard. The plaintiffs, on the other hand, argue that medical care is not included in section 17000.5's GA standard, because it is not expressly *included*, and all 58 California counties have historically provided health care through programs that were separate and distinct from general assistance.

The County correctly argues that *Boehm I, supra,* 163 Cal.App.3d 447, *Boehm II, supra,* 178 Cal.App.3d 494, and the cases which followed them ("the *Boehm* line of cases") construed section 17001 to require that standards of aid be based upon empirical studies of the actual cost of basic subsistence needs in the particular county. (*Whitfield* v. *Board of Supervisors, supra,* 227 Cal.App.3d at pp. 460-461; *Boehm I, supra,* 163 Cal.App.3d at p. 452-453; see also, *Guidotti* v. *County of Yolo, supra,* 214 Cal.App.3d at p. 1561, fn. 10; *Poverty Resistance Center* v. *Hart, supra,* 213 Cal.App.3d at p. 304.) However, the County is only *partially* correct in arguing that the standard was required to include allowances for food, clothing, housing, utilities, transportation *and medical care*. There was an important proviso upon the county's obligation to provide any particular form of aid: a particular need could be omitted if a study demonstrated that the omitted need was "satisfied by some other program available to the GA recipients." (*Oberlander, supra,* 11 Cal.App.4th at p. 542; *Boehm II, supra,* 178 Cal.App.3d at p. 502.)

Because *Boehm I, Boehm II* and their progeny required GA grant levels to be based upon needs which included medical care (unless a need was otherwise satisfied), the County contends medical care has at all relevant times been included among the needs addressed by the GA standard of aid. The County thus further contends it is entitled to reduce *cash* grant levels by the amount of the imputed value of free medical care which the County provides in kind to GA recipients, in the same way as cash grants are reduced by the value of housing and food provided in county shelters. (See, e.g., *Oberlander, supra,* 11 Cal.App.4th at pp. 545-546.)

If standards of aid have, in fact, historically been based in part upon calculations which took account of medical care costs, then the County is correct. Obviously, if the costs of medical care are considered in assessing the needs which must be met by GA grants, and hence are included in establishing the GA standard, then it is reasonable to deduct the value of medical care from the amount of cash grants if medical care is provided in kind. However, no case cited by the County, or which we have been able to

discover, indicates that medical care *actually* was considered by any county in calculating its GA standard of aid under the *Boehm* line of cases. To the contrary, it appears from a survey of the cases cited by the County that medical care has at all times been deemed a need which could be omitted from the GA standard, as being met by another program, namely, state and county health programs provided through the State Department of Health Services and cooperating county departments of health services.

*Boehm I, supra,* 163 Cal.App.3d 447, merely held generally that the GA level cannot be set without a factual study of subsistence needs; *Boehm I* did not address the question of what needs must be included in the study. This question was reached in *Boehm II, supra,* 178 Cal.App.3d 494. In that case, the court declared inadequate as a matter of law a study which encompassed only food, housing and utilities. (178 Cal.App.3d at pp. 502-504.) The specific flaw which the court found in the study was that it was "restricted solely to food and housing (including utilities) and that the County had before it no study that demonstrated that clothing, essential transportation and medical care were being provided by any other program available to GA recipients." (178 Cal.App.3d at p. 503.) The court ruled that the GA grant fixed by a county "must include an appropriate allowance for each of the basic necessities of life: food, clothing, housing (including utilities), transportation and medical care. If the GA grant fails to provide for any of those needs, the omission must be based on a study *that demonstrates the need omitted will be satisfied by some other program available to the GA recipients.*" (*Id.* at p. 502, italics added.)

In cases which followed *Boehm I* and *Boehm II*, the courts considered several specific challenges to the so-called "*Boehm* studies," i.e., studies required by *Boehm I* and *Boehm II*, upon which various counties purported to base their GA grants. Generally, the challenges were based upon failure to make reliable assessments of food or housing costs, or failure to make a truly *local* study, not upon failure to consider costs of medical care. Like *Oberlander, supra,* 11 Cal.App.4th 535, the cases which followed *Boehm I* and *Boehm II* concerned challenges based upon needs *other than* medical care, which were found not to be appropriately met by the challenged GA standards.

In *Poverty Resistance Center* v. *Hart, supra,* 213 Cal.App.3d 295, the court invalidated Sacramento County's GA grant on two grounds. First, the court found there was no evidence the allocation for housing was sufficient, inasmuch as the amount allocated was less than the lowest cost shown by the study. (213 Cal.App.3d at pp. 305-307.) Second, the court found the study's

assessment of food costs was based upon unsupported assumptions that the commodities surveyed were in fact available to area GA recipients at the costs reported. (*Id.* at pp. 311-313.)[11] In *Guidotti* v. *County of Yolo, supra,* 214 Cal.App.3d 1552, the Court of Appeal found the study upon which the county's GA standard was based to be so statistically flawed that it did not furnish substantial evidence that the actual costs of essential housing were as reported in the study. (214 Cal.App.3d at p. 1566.) In *Whitfield* v. *Board of Supervisors, supra,* 227 Cal.App.3d 451, the court found Alameda County's GA grant standard invalid because it was set to equal the AFDC grant, as annually adjusted based upon the California Needs Index, less $1, and was not based, as required by *Boehm I,* upon an actual study of local subsistence needs. (227 Cal.App.3d at pp. 459-461.)

Contrary to the County's argument, these authorities provide no support for its contention that medical care costs have historically been included in calculating GA grant levels. None of them involved challenges to GA standards based upon a failure to make allocations for medical care. Thus, none offer a hint as to whether medical care was provided by the grant, or was shown in the relevant study to be satisfied by another available program, a satisfactory alternative under *Boehm II.*[12]

c. *Under Applicable Statutes Health Care and the General Assistance Standard of Aid Are Separate Programs.*

■ Section 17000 requires every county in the state to "relieve and support" all indigent residents. This requirement comprises a duty to provide both general assistance in securing the ordinary day-to-day needs of basic survival (*Boehm I, supra,* 163 Cal.App.3d at pp. 499-500) and "medically necessary" health care services. (*County of Alameda* v. *State Bd. of Control* (1993) 14 Cal.App.4th 1096, 1108 [18 Cal.Rptr.2d 487].) Section 17001 requires counties to adopt "standards of *aid and care.*"

Section 17000.5 authorizes counties to adopt a "general assistance standard of *aid*" calculated at 62 percent of the 1991 federal official poverty line.

---

[11]The court rejected the contention of the plaintiff GA recipients that the costs of patent medicines should have been factored into the GA standard. The court found the County could rationally conclude that medical care provided at county clinics and the University of California Medical Center would be sufficient. (213 Cal.App.3d at p. 309.)

[12]Nor is the County's argument furthered by the court's finding in *Poverty Resistance Center* v. *Hart, supra,* 213 Cal.App.3d 295 that the board was entitled to infer the medical services it provided at county clinics and at the University of California Medical Center were adequate to meet subsistence medical needs. (See 213 Cal.App.3d at p. 309.) To the contrary, the finding tends to suggest—although it does not prove—that Sacramento County deemed medical costs to be satisfied by a program other than the GA grant, namely the county clinics and whatever contractual arrangement the county had with the University of California, and thus did *not* factor medical needs into the calculation of the GA grant level.

We must assume the omission of "care" in section 17000.5 is significant (*EDC Associates, Ltd.* v. *Gutierrez* (1984) 153 Cal.App.3d 167, 172 [200 Cal.Rptr. 333, 39 A.L.R.4th 1191]; *Kaiser Steel Corp.* v. *County of Solano* (1979) 90 Cal.App.3d 662, 667 [153 Cal.Rptr. 546]), and that the provisions of section 17000.5 apply only to "aid," not to "care." This presumption is confirmed by the definition of "aid" in section 10052 of the code and by the overall structure of the statutory system which governs the delivery of medical care and other forms of relief to the poor.

### (1)  *Section 10052*

"Aid" is defined in section 10052 of the code as "financial assistance provided to or on behalf of needy persons under the terms of this division, including direct money payments and vendor payments." That definition applies to all uses of the term in division 9 of the code, "unless the context otherwise requires." Division 9 governs "Public Social Services" generally. Section 17000.5 is in part 5 (County Aid and Relief to Indigents) of division 9.

Prior to 1977, section 10052 defined "aid" as including medical care. (Stats. 1965, ch. 1784, § 5, p. 3779.) However, in 1977, the Legislature undertook a major reorganization of the agencies that administer the state's various health and human service programs. This reorganization was implemented through legislation which amended several hundred separate statutes in a dozen separate codes, including section 10052. (Stats. 1977, ch. 1252, p. 4283.) The amendment to section 10052 deleted "medical care" from matters defined as "aid" in division 9. (Stats. 1977, ch. 1252, § 715, p. 4630.) At the same time, section 10051 was amended to *add* "health care services and medical assistance" to the definition of the broader category of "public social services." (Stats. 1977, ch. 1252, § 714, p. 4630; cf. Stats. 1971, ch. 1593, § 503 p. 3389; see generally Historical & Statutory Notes, 74 West's Ann. Welf. & Inst. Code (1991 ed.) § 10051, p. 11.)[13]

The purpose of the institutional reorganization effected by chapter 1252 was to increase the effectiveness of the state's health programs by clarifying lines of authority and organizational responsibilities. In particular, the Legislature found it necessary "to separate the major functional areas of the

---

[13]Section 10051 now provides: " 'Public social services' means those activities and functions of state and local government administered or supervised by the [State Department of Social Services] or the State Department of Health Services and involved in providing aid or services or both, including health care services and medical assistance, to those people of the state who, because of their economic circumstances or social condition, are in need thereof and may benefit thereby."

State Department of Health into distinct departments with leadership more directly responsible to the Governor and the Legislature." A further purpose of the reorganization was to foster "a cooperative and mutually supportive partnership between state and county government." (Stats. 1977, ch. 1252, § 1, pp. 4286-4287.)

In the context of the purposes and general effect of this legislation, it would seem that the intent and effect of the specific provision which deleted medical care from the definition of "aid" as used in division 9 were to indicate that the provision of medical care through the Department of Health Services in cooperation with county departments of health services was to constitute a separate and distinct governmental function from the provision of "aid" as a part of the counties' responsibilities under section 17000.[14]

(2) *Provisions in Parts 4.5 and 4.7 of Division 9 Governing Health Care.*

Further indications that health care is historically "another program," separate from GA, that is available to GA recipients are the circumstances that (1) separate County departments administer health care programs and general relief respectively and (2) county health care programs are governed in separate parts of the Code from the part which governs cash grants and forms of in-kind relief other than health care. In Los Angeles County, the department of health services (DHS) administers the delivery of medical care to the indigent, and the department of public social services (DPSS) administers the GA program. Separate parts of division 9 of the code also govern the counties' health care and general assistance functions.

"County Health Services" are governed by the statutes in part 4.5 of division 9. Division 4.7, enacted as an urgency measure in 1989, governs "Health Care For Indigents." (Stats. 1989, ch. 1331, §§ 9, 19.)[15] Chapter 5 of part 4.7 (§§ 16940-16995) establishes the CHIP (see § 16940), which includes provisions for allocating funds to the counties (see § 16941) and imposes requirements for county contributions (§ 16990). Section 17000.5, as we have observed, is found in a separate part of division 9—part 5 (commencing with § 17000), "County Aid and Relief to Indigents."

---

[14]In view of the clear definition of "aid" which appears in section 10052, we will not read significance into the circumstance that the term was used loosely with varying references in the *Boehm* line of cases, as the County urges us to do.

[15]When originally enacted, part 4.7 included a "sunset provision," under which it would be repealed effective January 1, 1992, unless extended by a later statute. (Stats. 1989, ch. 1331, § 9, p. 5432.) The part was extended and now contains a sunset provision under which it is repealed effective January 1, 1997, unless further extended. (§ 16997.1.)

Section 16990 requires every county which receives CHIP funds to maintain a specified level of financial support for health services, which amount is adjusted at the beginning of each fiscal year according to a formula provided in the statute.[16] Read together, section 16990 and section 17000.5, which separately mandates a minimum GA standard, logically require counties *both* to (1) fund medical services for the indigent at the levels specified in section 16990, and (2) provide the minimum amount of GA specified in section 17000.5. These two requirements meet a county's two-part obligation under section 17000 to relieve and support the poor through assistance in securing the needs of basic survival and medically necessary health care services.[17]

### (3) *The AFDC Level.*

Section 17000.5 authorizes counties to adopt a GA standard that equals 62 percent of the 1991 federal official poverty line,[18] and to make annual adjustments in the standard that equal the annual adjustments to grants made under the AFDC program. (See ch. 2, "Aid to Families With Dependent Children" (commencing with § 11200) of pt. 3, "Aid and Medical Assistance," of div. 9.) The initial authorized GA grant of 62 percent of the federal official poverty line was approximately equal to the 1990 and 1991 AFDC basic standard of care, as provided in section 11452;[19] adjustments in the GA grant are pegged to adjustments in the AFDC grants, as provided in section 11453. (§ 17000.5.)

---

[16]It was in order to meet the requirements imposed by section 16990 that the County devised the fund shift that is challenged in this case, as we shall discuss.

[17]Section 16995.1 provides that the receipt of CHIP funds shall not relieve a county of its obligation to provide indigent health care as required by section 17000.

[18]Prior to oral argument, we requested information from the parties on the cost of living factors which are used in establishing the poverty line. We requested this information because we believed that if the costs which were considered in setting the poverty line included health care costs as a substantial component, then such costs could reasonably be deemed a component of the GA standard, and could be provided in kind as the County argues, at least in proportion to their weight in setting the poverty line. From information furnished by the parties, it appears the poverty line was established in the 1960's, based upon a survey of subsistence costs for food. Food costs were then multiplied by three, based upon an earlier survey which had established that the average family spent one third of its income on food. Health care costs were thus not specifically considered in establishing the original poverty line. The poverty line has since been adjusted annually, based upon changes in the Consumer Price Index. The consumer price index includes health care costs, but only as a minor component.

[19]The 1991 poverty line was $6,620 per year. (*Oberlander, supra,* 11 Cal.App.4th at p. 539, citing United States Department of Health and Human Services (HHS) Annual Update of the HHS Poverty Income Guidelines, 56 Fed.Reg. 6859 (Feb. 20, 1991).) Sixty-two percent of that amount is $4,104.40. That figure divided by 12 is $341.03 The AFDC basic standard of care in 1991 was $342 per month. (§ 11452, subd. (a)(2).)

Section 11452 provides that the AFDC basic standard of care is intended to address needs for housing, clothing, food, utilities, miscellaneous other needs, and health care *to the extent not otherwise provided at public expense.* (§ 11452, subd. (a)(1).) However, all persons eligible for AFDC are, in fact, otherwise provided with health care at public expense through Medi-Cal, for which such persons are automatically eligible. (§ 14005.1; Cal. Code Regs., tit. 22, §§ 50201, 50227; *County of Alameda* v. *State Bd. of Control, supra,* 14 Cal.App.4th at p. 1107; *Cooke* v. *Superior Court* (1989) 213 Cal.App.3d 401, 411 [261 Cal.Rptr. 706].) Where the Legislature pegged GA grant levels to the AFDC grant levels, it is reasonably inferable that the Legislature intended the GA grants to address the same needs as the AFDC grants.

We are constrained to acknowledge that the inference we have made here respecting medical care is one which the court in *Oberlander, supra,* 11 Cal.App.4th 535, declined to make respecting the "special needs" that were at issue in that case. As we have observed, the *Oberlander* court rejected an argument by the plaintiffs that the Legislature did not intend special needs allowances to be covered by the basic section 17000.5 GA grant because that grant was pegged to the AFDC grant, and the statutes governing AFDC provide that special needs grants are an add-on to the basic grant. (11 Cal.App.4th at pp. 547-548.) However, the court rejected this argument for the express and specific reason that nothing in the language of section 17000.5 distinguished between flat monthly grant payments on the one hand and supplemental grants for special needs on the other, and nothing excluded the latter from the "general assistance standard of aid." (11 Cal.App.4th at p. 548.) Nor did the plaintiffs in *Oberlander* bring to the court's attention any provision in any statute related to section 17000.5 which drew a distinction between basic and special GA grants. By contrast, section 17000.5 applies, by its plain language, only to "aid," a term which is defined as *excluding* medical care. In addition, the overall statutory scheme governing public social services provides for the delivery of medical care separately from the provisions for GA. Thus, our conclusion that the GA standard is not intended to cover medical care is not based solely upon the relationship between the GA grant level and the AFDC grant level which is established by section 17000.5. Rather, we reach that conclusion because of the cumulative effect of *all* of the factors we have considered bearing on the question of section 17000.5's scope.

### (4) *The Legislative History of Section 17000.5*

As we have described, section 17000.5 authorizes counties to deduct "in-kind *aid*" from the amount of aid which they provide as GA cash grants.

However: (1) the definition of "aid" in the code excludes medical care; (2) such exclusion appears to have been an intended effect of the reorganization of state health programs under chapter 1252, Statutes of 1977; (3) in practice, health programs are administratively separate from general relief programs; and (4) the GA standard is pegged to grant amounts under another program, AFDC, which establishes grant levels without regard to most significant medical care costs. Under the totality of these circumstances, it is difficult to conclude that section 17000.5 authorizes deduction of medical care costs from the County's GA obligations. Nothing in the legislative history of that section supports a contrary conclusion.

Contrary to the County's contention, the circumstance that Assembly Bill No. 1012 (Stats. 1992, ch. 719) repealed Health and Safety Code section 1442 and amended Health and Safety Code section 1442.5, as well as amending section 17000.5, is of no significance with respect to the question of whether the section 17000.5 GA standard includes health care costs. Health and Safety Code sections 1442 and 1442.5 were enacted as parts of the 1974 Beilenson Act. Section 1442 required a county to file specified documents with the State Department of Health Services before closing a county medical facility or reducing services. Section 1442.5 required a county to hold public hearings before closing a medical facility or reducing service, and to provide for an alternative means of providing medical services to the poor. Subdivision (c) of section 1442.5 required the quality of medical care provided to the poor to be the same as that provided in private facilities in the county. Assembly Bill No. 1012 repealed section 1442, relaxed the requirements in section 1442.5 respecting public hearings, and deleted subdivision (c) from section 1442.5. (Stats. 1992, ch. 719 (Assem. Bill No. 1012) §§ 1-2.)[20]

The County contends the Legislature could not have intended to relieve counties from the health care spending standards in the Beilenson Act, yet

[20]Assembly Bill No. 1012 also provided relief from counties' health care burdens beyond the amendments to the Beilenson Act. In particular, among other matters, that piece of legislation (1) amended section 16990 (the statute which requires counties to maintain specified levels of financial support for health services in order to receive funds from the CHIP account), to (a) reduce each county's financial obligation in fiscal 1991-1992 to reflect shortfalls in sales tax revenue and in county deposits in certain trust fund accounts, and (b) reduce each county's financial obligation in fiscal 1992-1993 by 7 percent (Stats. 1992, ch. 719 (Assem. Bill No. 1012) § 10); (2) amended section 16995 by deleting former subdivision (a) of that section, which had provided that, to receive CHIP funds, a county must not impose more stringent eligibility standards for benefits under section 17000, or reduce the scope of benefits available under that section compared to those in effect on November 8, 1988 (Stats. 1992, ch. 719 (Assem. Bill No. 1012) § 11); (3) repealed former section 16995.2, which had required a county which received CHIP funds to maintain at least the same number of outpatient visits in fiscal 1989-1990 and 1990-1991 as were provided in fiscal 1988-1989 (Stats. 1992, ch. 719 (Assem. Bill No. 1012) § 12). As we have already noted, the Legislature

require what it characterizes as "open-ended health care spending under Section 17000." However, we fail to see why the Legislature could *not* have intended to give counties partial, but not complete, relief from their admittedly onerous health care burdens. Legislatures make compromises of this kind in every legislative session, although the choices naturally become more difficult in hard times.

Nor are we persuaded that the County's reading of section 17000.5 would, in fact, prevent "open-ended health care spending." All that follows if health care costs can be set off against a county's GA obligation under section 17000.5 is that the GA grant amount, which *is* capped under section 17000.5, must be spread more thinly than it would be otherwise, as it must satisfy not only the obligation to provide food, housing, transportation and clothing, but at least some component of the obligation to provide health care. Both obligations must still be met (§ 17000; *Boehm I, supra,* 163 Cal.App.3d at p. 451; *County of Alameda* v. *State Bd. of Control, supra,* 14 Cal.4th at p. 1108), even though a county no longer must perform its own assessment of the costs of meeting them. (§ 17000.5; *Oberlander, supra,* 11 Cal.App.4th at p. 539.)

The issue in this case is distinguishable from the issue addressed by this court in *Board of Supervisors* v. *Superior Court* (1989) 207 Cal.App.3d 552 [254 Cal.Rptr. 905] *(Comer).* In *Comer,* the issue was whether a county's obligations under section 17000 to "relieve and support" the poor through the provision of mental health services where needed were limited by the provisions of the Short-Doyle Act (§ 5600 et seq.). Section 5709 of the Short-Doyle Act then provided that "[i]n no event shall counties be required to appropriate more than the amount required under the provisions of this chapter." In view of that specific and plain statutory provision, we held that section 17000 does not require counties to meet the needs of the indigent for mental health services beyond the financial limits set in the Short-Doyle Act. (207 Cal.App.3d at pp. 560-561.)

Here, there is no specific or plain statutory provision which supports the County's construction of section 17000.5. Nor does the legislative history of section 17000.5 (Stats. 1991, ch. 948, *ante*) or its 1992 amendments (Stats. 1992, chs. 719, 721, 722, *ante*) contain a specific expression of intent that the statute should be so construed. The absence from the legislative history of any affirmative expression of an intent to allow health care costs to be deducted from the GA cash grant compels us to conclude that such a result

did *not* repeal section 16995.1, which provides that receipt of CHIP funds does not relieve a county of its obligation to provide indigent health care *as required by section 17000.*

was not intended.[21] A specific, plain and emphatic expression of legislative intent would be necessary to justify the sweeping and drastic consequences to the plaintiffs of so construing the statute. (*Chisom* v. *Roemer* (1991) 501 U.S. 380, 396 [115 L.Ed.2d 348, 364, 111 S.Ct. 2354].)

   d.   *On This Record, the Consistent Past Practice of Los Angeles County Has Been to Treat Health Care Separately From the General Assistance Standard of Aid.*

The County contends there is nothing sweeping or drastic about setting off health care costs against the GA grant under section 17000.5, as they claim health care costs were always included in setting the GA standard under section 17001 and the *Boehm* cases. However, as we have observed, this claim is not supported either by the holdings in the *Boehm* cases or by the structure of the statutory scheme which governs health care and general relief. Neither is it supported by the record before us which relates to historical practices in the delivery of aid and care.

In particular, it appears from the record that in Los Angeles County health care has never been considered part of GA. This appears from the stipulated judgment which was entered in Mendly v. Los Angeles County, *supra*, No. BC 017558, in 1991. It is recited in that judgment that both parties agree that the grant amounts provided in the judgment are "adequate and sufficient to meet the minimum subsistence needs of Los Angeles County [GA] recipients *which are targeted for assistance by such cash grant amounts*, and are thereby adequate and sufficient to meet and discharge *any and all legal obligations of defendants* which are alleged in the Complaint. . . ." (Italics added.) Specifically, it is recited that the amounts provided in the stipulated judgment are adequate to meet subsistence needs for "housing, food, clothing and personal needs . . . ." The judgment also recites that the grant amount contains a housing component, a food component and a personal care and household upkeep component, and provides that if there are increases in the total amount of the grant, such increases will be allocated 64.2 percent to the

---

[21]In support of their position, plaintiffs cite a number of comments by individual legislators, including a letter written by Senators Marian Bergeson, Mike Thompson and Dan McCorquodale and inserted in the Senate Daily Journal after the trial court rendered its decision in this case. In the letter, the senators disavow any intent or understanding "that the value of indigent health care services was considered in-kind aid which could be limited by the dollar standard of [§ 17000.5]." (Sen. J. (1993-1994 Reg. Sess.) p. 3353, quoted in Historical & Statutory Notes, 75 West's Ann. Welf. & Inst. Code (1995 pocket supp.) § 17000.5, p. 33.) The County rightly argues that such statements by individual legislators are not reliable guides to the intent of the Legislature as a whole. (*Oberlander, supra*, 11 Cal.App.4th at pp. 547-548.) However, the *absence* of a clear expression of intent to change longstanding practices is a matter which we can, and should, consider in construing the statute.

housing component, 30.8 percent to the food component and 5 percent to the personal care and household upkeep component. The judgment provides for a clothing allowance of $111 per year, which is separate from the basic grant. *There is no mention anywhere in the stipulated judgment of any provision for medical care.* It is simply inconceivable that either party would have left medical care unmentioned in the stipulated judgment if either believed it was or should be a component of general assistance.

In addition, the declarations of Donald C. Petite, controller of County's DHS, and Harry L. Hufford, the County's (former) chief administrative officer, tend to rebut, rather than confirm, the County's claim that health care costs have historically been included in calculating GA grant levels. Petite's declaration sets forth that DHS has always provided health services to medically indigent residents of the County. However, on July 29, 1993, for the first time, the board of supervisors directed that GA recipients who receive such care be enrolled in the County's CHP, through which they will continue to receive most of the same services they have always received.[22] Petite further states that his office conducted a survey of the actual costs incurred for the care of GA recipients in the 1992 to 1993 fiscal year and determined that the monthly cost of health care per GA recipient was $96, and the monthly cost per recipient for services that will continue to be provided by DHS outside the CHP plan was $1.[23]

Hufford's declaration sets forth numerous painful funding dilemmas which the County faced in 1993. These include the circumstances that transfers of property taxes from County programs to state programs over the

---

[22]Petite and Hufford both state in their declarations that the CHP provides GA recipients with "enhanced access" to health care services, but they do not specify the manner in which access is enhanced.

[23]In pertinent parts of his declaration, Petite states: "[¶] 4. DHS provides free or reduced cost health care to persons within the County lacking the resources to fully pay for such care. Among those persons who receive health care services at no cost from DHS are persons receiving General Relief [GA] grants through the County Department of Public Social Services. . . . [¶] 5. By an action taken on July 29, 1993, the County Board of Supervisors directed that [GA] recipients be given membership in the CHP beginning September 1, 1993. As CHP members, [GA] recipients will have enhanced access to the full range of benefits currently available to them through DHS operated facilities, with some minor exceptions. These exceptions primarily include dental care, podiatry and vision care services, which will continue to be provided to [GA] recipients by DHS, but not through the CHP. [¶] . . . [¶] 7. At my direction, DHS staff have conducted a study of the actual costs incurred by the County per [GA] recipient in the 1992-1993 fiscal year to provide health care services to persons receiving [GA] benefits. . . . This study resulted in a finding of monthly costs per [GA] recipient during the 1992-93 fiscal year of $96 for those services which will be provided through the CHP after September 1, 1993, and a monthly cost of $1 for those services which will continue to be provided by DHS, but not through the CHP."

two years preceding 1993 had resulted in a 44 percent reduction in County revenues from property taxes, while the number of persons applying and qualifying for GA had increased by 42 percent and was continuing to climb, with the result that the demand for GA grants was expected to be $375.2 million in the 1993-1994 fiscal year, an increase of 21.5 percent over the amount budgeted in 1992-1993. The expected increase in GA requirements was based upon the grant level in effect in fiscal 1992-1993. Hufford further states the GA budget consumes 25 percent of County property taxes. Discretionary funds are the only source of funds for GA and also are the only source of funds for DHS, which is required by state law to meet specified funding levels in order to qualify for state matching funds. Hufford represents that the County's health care funding obligation for fiscal 1993-1994 was $421 million.[24] Finally, Hufford states that, *in response to its funding crisis*, the County determined to provide health care to GA recipients through the CHP, reduce the GA cash grant to reflect the value of the health care services, and transfer the funds thus recovered from the budget of the DPSS to the DHS.[25]

From the declarations of Petite and Hufford, as well as inferences from the provisions of the stipulated judgment in *Mendly*, it appears that, in the past, the County has provided health care services to the medically indigent, including GA recipients, through programs administered by the DHS which were "separate and distinct from its general relief program, that is, "other program[s] available to the GA recipients," within the meaning of *Boehm II*, *supra* (178 Cal.App.3d at p. 502). Thus, the County would not have been required under *Boehm II* to include an allowance for health care when setting the GA grant level. The decision to characterize health care as a form of in-kind aid provided through the GA program appears to have been made only in response to unprecedented shortfalls in the DHS budget on the one hand, and on the other, the opportunity offered by section 17000.5 to

---

[24]These funding obligations, as well as the allowable reductions to reflect revenue shortfalls, appear in section 16990, which we have discussed above.

[25]We need not quote verbatim Hufford's explanation of the County's specific funding shortfalls. However, his explanation of the relationship between the budget shortfalls and the decision to enroll GA recipients in the CHP is as follows, in pertinent part: "19. In budget deliberations, we determined that the DHS MOE ["Maintenance Of Effort"] required for matching State funds could be met by providing [GA] recipient[s] health care through the County's Community Health Plan (CHP). The CHP is a managed care health plan administered by the DHS. [¶] 20. Welfare and Institutions Code section 17000.5(a) permits a county's standard of aid for [GA] to include the value of in-kind benefits. If health care for [GA] recipients was provided through the CHP, the cash portion of the [GA] grant could be reduced to reflect the value of this in-kind aid. The funds for this cost would be transferred from the budget of DPSS, which administers the CHP. As a result, the DHS budget would increase to minimum MOE levels, and at the same time, [GA] recipients would have health care through a managed care program, providing greater access to health services."

establish a GA standard, the components of which no longer needed to be itemized.

If, as appears from the foregoing, health care costs were not historically considered in establishing the GA standard under section 17001 and the *Boehm* cases, the consequences of the County's reading of section 17000.5, and the actions which it purports to take based upon that reading, are novel, drastic and sweeping. Prior to the setting of the 1993 grant level, a single GA recipient in the County who did not share housing received $293, plus a $9 clothing allowance, per month. This grant addressed needs for food, housing, transportation, clothing and miscellaneous personal needs. Health care was separately provided through the DHS. After a reduction in grant levels which was authorized by the adjustment formula in section 17000.5, and the cash deduction against the imputed value of health care purportedly provided as in-kind aid through the CHP, the same GA recipient received $212 to cover all of the needs formerly covered by the fiscal 1992-1993 grant of $302.

## CONCLUSION

■  The question presented by this case is not whether the County's challenged action is a rational one, particularly in view of its fiscal crisis. The question, rather, is whether the action is authorized by the applicable statutes, including sections 16990 and 17000.5, which govern the County's obligations to fund health care services and provide general relief to the indigent. For all of the reasons set out herein, and based on the record presented to us, we are not convinced that such statutory authorization exists.[26]

Neither the controlling judicial authority, nor the legislative history of the applicable statutes, nor the history of public general assistance and publicly

---

[26]Because we have rejected the County's construction of section 17000.5 on the grounds stated herein, we need not address the plaintiffs' additional contentions that (1) the County's interpretation of the statute would theoretically justify either (a) setting off larger and larger shares of the GA grant against imputed health care costs until all other subsistence needs were crowded out, or (b) eliminating in-kind medical services and providing only a $285 grant from which a GA recipient must satisfy all of his or her subsistence needs, including medical care; and (2) the County's interpretation of section 17000.5 would render redundant section 17000.6, which allows counties to reduce the GA grant to 40 percent of the federal poverty line for one year upon application to the Commission on State Mandates and a showing that meeting the standard in 17000.5 would result in "significant financial distress." We would only remark parenthetically that the theoretical possibilities suggested by the first of the above arguments are at present only speculative. Regarding the second argument, we are not persuaded that section 17000.6 would be rendered redundant by the County's interpretation of section 17000.5. It is not hard to imagine that a county might suffer "significant financial distress" if required to provide GA at 62 percent of the poverty line to large numbers of qualifying persons, even if the grant included an allowance for in-kind medical services. In such circumstances, the county would apply for an additional reduction under section

provided medical care, nor the available evidence of past practices in Los Angeles County, supports the County's contention that section 17000.5 authorizes the County to deduct health care costs from its general assistance cash grant. For purposes of resolving the plaintiffs' likelihood of success on the merits of their action, we must conclude that health care is not "aid" under the statutes and cannot be so credited against a county's obligations under section 17000.5. As plaintiffs satisfied both of the predicate requirements for a preliminary injunction, it was error for the trial court to deny it.

In reaching this conclusion we are not unmindful of its far-reaching consequences or the impact it will have upon the difficult public policy choices already made by the County with respect to the proper allocation of scarce public resources. Such choices are more properly made by legislative bodies than by the courts. However, as we view it, we have no alternative but to reach the result which we do. When the County proposes such a substantial change in the status quo, one which will have such a significant adverse impact on so many people, it is not unreasonable for the courts to insist that there be clear legislative authority in the statute upon which the County purports to rely. As we have stated, the relevant statutes are silent on the critical question raised by this appeal. Thus, it is to the Legislature that the County must look for the authority to reduce the funds available for general relief to the needy.

### DISPOSITION

The order denying a preliminary injunction is reversed. The trial court is directed to enter an order granting the preliminary injunction and to conduct such further proceedings as are appropriate in accordance with the views expressed herein. Costs are awarded to the plaintiffs.

Kitching, J., and Aldrich, J., concurred.

A petition for a rehearing was denied May 17, 1995, and respondents' petition for review by the Supreme Court was denied July 13, 1995. Lucas, C. J., and Baxter, J., were of the opinion that the petition should be granted.

---

17000.6. For purposes of determining whether the County's reading of section 17000.5 logically, or as a matter of law, renders section 17000.6 redundant, we must regard as coincidental the fact that the amount which the County has purported to deduct from the GA *cash* grant for in-kind medical services under section 17000.5 approximates the amount by which the *total* grant could be reduced under section 17000.6.