[No. B093679. Second Dist., Div. Four. Aug. 22, 1996.]

DAISY TAILFEATHER et al., Plaintiffs and Appellants, v.
BOARD OF SUPERVISORS OF LOS ANGELES COUNTY et al.,
Defendants and Respondents.

## COUNSEL

Western Center on Law and Poverty, Robert D. Newman, Clare Pastore, Richard A. Rothschild San Fernando Valley Neighborhood Legal Services, Beth A. Osthimer, National Health Law Program, Yolanda C. Vera, Legal Aid Foundation of Los Angeles, Kirk McInnis, Yolanda Arias, American Civil Liberties Union, Mark Rosenbaum, Silvia Argueta, Legal Services Program for Pasadena and San Gabriel-Pomona Valley and John E. Rittmayer for Plaintiffs and Appellants.

De Witt W. Clinton, County Counsel, Roberta M. Fesler, Assistant County Counsel, Steven J. Carnevale, Patrick A. Wu and Ada Treiger, Principal Deputy County Counsel, for Defendants and Respondents.

## OPINION

**BARON, J.**—Plaintiffs, a group of indigent residents of the County of Los Angeles who rely on county medical facilities, brought a complaint for injunctive and declaratory relief and a petition for writ of mandate against the Board of Supervisors of the County of Los Angeles and Robert C. Gates, the Director of the Los Angeles County Department of Health Services (collectively referred to as the County). Plaintiffs sought a ruling that the

County violated its duties under various provisions of the Welfare and Institutions Code by failing to adopt formal written standards governing waiting times for receipt of medical care. The trial court granted the County's motion for summary judgment, and plaintiffs appealed. Limiting our review to the narrow issue raised by the complaint, we conclude that the statute does not mandate the adoption of formal standards concerning waiting times for medical care and affirm the grant of summary judgment, although we disagree with some of the grounds set forth in the trial court's order.

### FACTUAL AND PROCEDURAL BACKGROUND

*The Complaint*

According to the complaint filed by plaintiffs herein, "[i]t is a common experience for the needy poor to wait many weeks, even months, to obtain a scheduled appointment at a County outpatient clinic." Plaintiffs allege that the County is responsible for these backlogs because it "has failed to establish written standards concerning access for the poor to necessary medical care at County facilities, including, in particular, reasonable waiting times for a scheduled appointment at a County outpatient clinic and for examination and treatment in a County emergency room." In addition, "the County has failed to adopt some system or plan for monitoring the poor's access to necessary medical care at County facilities and for addressing problems, such as the current backlog of scheduled appointment at the outpatient clinics." In a somewhat different vein, the complaint also contends that the County has violated Health and Safety Code former section 450 and "failed to protect and preserve the public health" by "allowing harmful and contagious medical conditions to increase and spread in the absence of any standards concerning the prompt delivery of care to the dependent poor at the County's hospitals and health centers."

The plaintiffs[1] sought to represent a class "consisting of all indigent residents of the County who are or will be in need of the medical services

---

[1]According to the complaint, plaintiff Daisy Tailfeather has multiple health problems, including possibly tuberculosis, and depends on County-USC Medical Center for health care. Plaintiff Lucy Ritorto relies on Harbor-UCLA Medical Center, and "does not get the medical care that she needs because she cannot leave her [invalid] daughter long enough to go to and from Harbor-UCLA Medical Center and wait the many hours which are required to be seen by the medical staff." Plaintiff Elizabeth Mendly has extruded discs, a collapsed spine and other medical problems. "[T]he trip [to County-USC] and the extended waits to be seen aggravate her condition." Plaintiff Abelardo Rodriguez "has several medical conditions which prevent him from working, including diabetes, herniated discs in his lower spine and high blood pressure." In addition, he "suffers periodically from chest pains and shortness of breath." When he "becomes ill between his scheduled appointments at the Internal Medicine Clinic, he has no alternative but to go to the emergency room and wait the many hours

provided by the Los Angeles County Department of Health Services." By order dated July 7, 1994, the class was certified.

The complaint sought a writ of mandate, an injunction, or a declaratory relief judgment "compelling defendants to perform acts required by State law as set forth in the above causes of action, namely: to promulgate and adopt standards on indigents' access to essential medical care at County facilities, especially as to reasonable and adequate waiting times to be seen for emergency care and outpatient specialty care; and to operate these County facilities in accordance with such standards."

*The Cross-motions for Summary Judgment*

Both sides moved for summary judgment, agreeing that the sole issue presented—whether the County was required to adopt formal written standards concerning reasonable waiting times for indigent medical care—was one of law. Few "facts" were set forth in statements of undisputed facts. The County's statement consisted of: (1) a description of the class which had been certified by the court, (2) the dates of various legislative actions, and (3) statements of legal principles most of which were to be determined by the ruling on the motion. Plaintiffs established in their statement of undisputed facts certain background matters, including: (1) the number of medical facilities in the County, (2) the fact that the County had not adopted any ordinances or resolutions to address waiting times or to monitor whether outpatient care appointments were scheduled pursuant to the treating physicians' instructions or whether emergency care patients were seen in accordance with triage guidelines,[2] (3) that the County denied that it had a legal obligation to adopt any such ordinances, and (4) that as of July of 1994, 99 outpatient clinics in the County health care system reported backlogs of appointments of 10 weeks or more.

In addition, both sides submitted lengthy declarations containing additional factual assertions. Robert C. Gates, Director of the Department of

---

required to be seen there." Plaintiff Lydia Brewer "has a family history of diabetes and high blood pressure." She "should receive annual medical examination[s], but defendant County does not provide such regular examinations." Plaintiff Jose Gamez "experiences back and kidney pains" and "depends on defendant County for medical care through its 'Ability to Pay' ('ATP') program." Plaintiff Mattie Glover "suffers from an irregular heartbeat for which she must take medication"; she "requires regular monitoring . . . and must be regularly re-examined to obtain refills of her prescription medicine"; and "received an appointment with a cardiologist six weeks after her last Emergency Room Visit." Plaintiff Estela Madrigal "requires frequent medical attention because of intra-abdominal adhesions which cause severe pain, vomiting and diarrhea, and also suffers from a severe nervous condition. . . . She has experienced frequent delays in receiving service."

[2]In their moving papers, plaintiffs conceded that the four hospitals operated by the County have promulgated triage guidelines for their respective emergency rooms.

Health Services for the County (DHS), stated in his declaration on behalf of the County that the board of supervisors had created a task force for health care access. According to the declaration, the task force was charged with "providing the Board . . . a description of the critical unmet health needs of the medically uninsured/underinsured and the current capacity of public and private resources to meet these needs, ways to improve the health status of underserved residents by adjusting the existing splintered patterns of access and care through optimal utilization of existing resources." Gates's declaration established that DHS operates six hospitals, three with trauma centers, six comprehensive health centers, and forty public health centers. DHS submitted a strategic plan for the future to the board of supervisors in June 1992. "The Plan provided a framework for the overall future direction of the County's health services and for addressing specific issues and problems with County health care. The Plan provided the foundation for the integration of personal health services within geographic 'Clusters' and the transition to managed care." DHS established the community health plan (CHP) in order to test the managed care approach within a large, publicly operated health care system. The CHP is licensed by the California State Department of Corporations as a health care service plan under the Knox-Keene Act (Health & Saf. Code, § 1367 et seq.) and has been granted federal health maintenance organization qualification. CHP standards for appointment times are: "urgent—according to medical necessity; new member, non-urgent—30 working days; follow up, established patient—15 working days; specialty referral, non-referred patient—30 working days." The declaration went on to state that as of August of 1994, backlogs averaged 2.2 weeks in health center clinics and 3.5 weeks in hospital clinics. The wait for initial prenatal service backlogs averaged 1.2 weeks and for initial pediatric clinic services averaged 2.5 weeks. Three percent of the health center clinics and 11 percent of the hospital clinics had backlogs of 10 weeks or longer.

The declaration of William F. Loos, M.D., attending physician at County's Olive View Medical Center, submitted in support of the County's motion, described the order of treatment in County emergency rooms, stating that it was based on a "triage" system of sorting patients according to need. According to Dr. Loos, each County hospital adopts its own triage guidelines. He described the triage guidelines at Olive View, Martin Luther King, and Harbor-UCLA Medical Center. He further stated: "Patients having non-emergency conditions who seek care in County emergency rooms will be seen by emergency room physicians. Typically, such patients will be referred for appointments for outpatient care in the appropriate County outpatient facility, within the time specified by the physicians. [¶] . . . Appointments for out-patient care are scheduled according to referring physician specifications, even if this means scheduling some patients ahead

of previously scheduled patients with less urgent need. Typically, the longest scheduled appointments are for patients with the least critical conditions (those who are chronic or stable). Non-referred individuals who indicate an urgent need for care are referred to emergency rooms or urgent care clinics."

Plaintiffs also submitted declarations in support of their motion for summary judgment. More than two dozen physicians and other County health care workers described the waits experienced by nonurgent indigent patients suffering from chronic and undiagnosed medical conditions. The consensus of the declarants was that facilities and budgets should not be cut. There was no reference to a need for formal standards for wait times.

After the hearing on the motion, the trial court made numerous factual and legal determinations in a lengthy written order. The following are the most significant:

(1)   Assembly Bill No. 1012, 1991-1992 Regular Session, (passed in 1992) abolished the requirement of access standards for indigent health care and the only standards counties are required to meet for indigent health care and general relief are the fiscal standards in the realignment statutes[3] and section 17000.5 of the Welfare and Institutions Code. These statutes set the maximum amount that counties may be required to expend for these programs and plaintiffs have no right to require higher levels of health care spending.

(2)   Triage standards ensure that emergencies are timely treated.

(3)   The promptness of provision of care for medical health needs in County medical facilities is wholly discretionary.

(4)   The County should be able to distinguish ability to pay and Medi-Cal patients, accepting only those who cannot pay; it is not required to provide medical care to those who are ineligible for general relief.

---

[3]The realignment statutes established a "Local Reserve Fund," consisting of a sales tax account, a vehicle license account, a sales tax growth account, and a vehicle license fee growth account, into which certain fees and taxes would be deposited, out of which the counties would be allocated funds to meet certain health, social service, and mental health needs. (See Stats. 1991, ch. 89.)

(5) Section 17001 of the Welfare and Institutions Code[4] has been preempted by section 17000.5[5] and the County has met its duty to provide medical care to general relief recipients by enacting a sufficient standard of aid for general relief under section 17000.5.

(6) There are extreme backlogs at certain times at the County health facilities, but section 1445 of the Health and Safety Code[6] controls over section 10000 of the Welfare and Institutions Code[7] and "vests exclusive discretion over the reasonable promptness of medical care in County medical facilities with the Board of Supervisors."

(7) There is no entitlement to individual medical attention under former Health and Safety Code section 450 et seq.[8]

(8) There is no constitutional right to medical care.

(9) There is no clear, present, or ministerial obligation to adopt standards for waiting times in County medical facilities because the rules for operation of County medical facilities are entirely discretionary under section 1441 of the Health and Safety Code;[9] imposition of waiting time standards would clearly invade the area of discretion with which the board is vested which has been reasonably, properly and professionally exercised.

(10) The County has adopted standards for administering health services and the standards are not arbitrary or capricious or for the purpose of

---

[4]Welfare and Institutions Code section 17001 requires the adoption of certain "standards of aid and care" and is discussed in further detail below.

[5]Welfare and Institutions Code section 17000.5 allows the County to adopt a general assistance standard of aid, including in-kind aid, that is 62 percent of a guideline that is equal to the 1991 federal official poverty line.

[6]Health and Safety Code section 1445 provides that "[u]nder such limitations and restriction as are prescribed by law," each county "may provide for the care and maintenance of the indigent sick or dependent poor of the county, and may provide medical and dental care and health services and supplies to persons in need thereof who are unable to provide the same for themselves, and for these purposes may levy the necessary taxes. Each county may, insofar as it is able to do so, provide the means to meet promptly and adequately the health needs of the indigent sick, the aged, and the poor, for the better prevention of serious illness and incapacity, to the end that such persons will not become public charges at the greater expense of those resources set aside for the public health and welfare."

[7]As will be discussed in greater detail, Welfare and Institutions Code section 10000 states that the legislative purpose behind the enactment of certain provisions of the Welfare and Institutions Code is to ensure that "aid shall be administered and services provided promptly and humanely . . . ."

[8]That statute required the board of supervisors of each county to take measures to protect public health generally, and is now codified at section 101025 of the Health and Safety Code.

[9]Among other things, section 1441 of the Health and Safety Code provides that the board of supervisors in each county "may establish and maintain a county hospital" and "prescribe rules for the government and management thereof . . . ."

denying benefits to indigents. The board's discretion has been reasonably, properly and professionally exercised. County facilities meet all state requirements and medical standards.

(11) The County has diligently studied the problems arising from increasing demand for public health services and is moving to accommodate this demand through managed care. The County operates its facilities the best that it can within the present capacity.

(12) Defendants do not have the duty under Welfare and Institutions Code sections 10000 and 17001 or former Health and Safety Code section 450 or the due process clause to adopt standards concerning the prompt delivery of outpatient and emergency care to members of the class.

Plaintiffs appealed from the judgment entered.

DISCUSSION

I

From the tenor of their arguments, it is apparent that both sides are looking to the courts for resolution of difficult issues of policy concerning indigent health care and local government finances—problems with which the Legislature has struggled for decades. The parties expect too much. As we read it, the complaint raises but a single issue: whether the County is obligated by the provisions of the Welfare and Institutions Code, or any other provision, to adopt formal standards specifying maximum waiting times for receipt of medical care by indigents. In keeping with the policy of judicial restraint, we will limit our conclusions to those necessary to resolve that issue. Resolution of that issue does not require that we address questions concerning whether the County has an obligation to operate medical facilities or to provide medical care to Medi-Cal recipients or those deemed to have some ability to pay. Nor does it require inquiry into whether the County has in fact violated the due process rights of particular indigent individuals by failing to provide statutorily mandated medical care or by providing it in such an untimely fashion that the patients suffered needlessly or became seriously ill. The answers to those questions must await the case or cases in which they are properly raised.[10]

---

[10]The trial court, in its order, purported to make a number of factual findings and reach a number of legal conclusions unnecessary to its ruling that the County had no duty to adopt standards concerning the prompt delivery of outpatient and emergency care to the plaintiffs and their class. Because of our narrow holding, we have no occasion to express an opinion concerning the propriety of these findings and conclusions other than to say that to the extent

## II

Plaintiffs purport to find a legislatively imposed duty to enact standards for waiting times in the interrelationship of three statutes which have been part of the code for many years. First is Welfare and Institutions Code section 17000,[11] which provides: "Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions."[12] The next provision relied on is section 17001 which states: "The board of supervisors of each county, or the agency authorized by county charter, *shall adopt standards of aid and care* for the indigent and dependent poor of the county or city and county."[13] (Italics added.) Finally, plaintiffs point to section 10000 which recites the legislative purpose behind the public social services division of the Welfare and Institutions Code and provides: "The purpose of this division is to provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed. *It is the legislative intent that aid shall be administered and services provided promptly and humanely*, with due regard for the preservation of family life, and without discrimination . . . ."[14] (Italics added.)

We begin with a brief summation of the authorities whose analyses of these statutory provisions form the guidelines for our current understanding of the counties' obligations with regard to the provision of medical services to the poor. This background is necessary to an understanding of the County's argument that recent enactments have limited the scope of its obligations—a contention which was adopted by the trial court and which we must address before reaching the issue raised by the complaint.

---

the factual findings and the legal conclusions contained in the order were unnecessary to the judgment, they can have no precedential or collateral effect.

[11]Further statutory references are to the Welfare and Institutions Code unless otherwise specified.

[12]Its derivation is former section 2500, added by Statutes of 1937, chapter 464, page 1406. In *Mooney* v. *Pickett* (1971) 4 Cal.3d 669 [94 Cal.Rptr. 279, 483 P.2d 1231], the Supreme Court described how its provisions had their genesis in the Pauper Act of 1901 (Stats. 1901, ch. 210, p. 636), amended in 1933 to require aid to "all able-bodied indigent persons and those indigents incapacitated by age, disease or accident." (Stats. 1933, ch. 761, § 1, p. 2005.) The 1933 language, minus the phrase "able-bodied indigents," was incorporated into the newly enacted Welfare and Institutions Code in 1937 and has not changed substantially since. (4 Cal.3d at pp. 677-678.)

[13]Section 17001 was added by Statutes of 1965, chapter 1784, section 5, page 4090.

[14]Section 10000 was added by Statutes of 1965, chapter 1784, section 5, page 3978.

■ The courts have uniformly concluded that section 17000's reference to the counties' duty to "relieve and support" indigents includes a requirement for provision of medical care. (See, e.g., *Bay General Community Hospital* v. *County of San Diego* (1984) 156 Cal.App.3d 944, 958 [203 Cal.Rptr. 184]; *City of Lomita* v. *County of Los Angeles* (1983) 148 Cal.App.3d 671, 673 [196 Cal.Rptr. 221]; *County of San Diego* v. *Viloria* (1969) 276 Cal.App.2d 350, 352-353 [80 Cal.Rptr. 869].) In *Kinlaw* v. *State of California* (1991) 54 Cal.3d 326 [285 Cal.Rptr. 66, 814 P.2d 1308], the Supreme Court held that indigents did not have standing to sue the state to protest the shifting of financial responsibility for medical care from the state to the counties. At the same time, the court noted: "Plaintiffs are not without a remedy if the county fails to provide adequate health care, however. They may enforce the obligation imposed on the county by Welfare and Institutions Code sections 17000 and 17001, and by judicial action. [Citation.]" (54 Cal.3d at p. 336, fn. 8, citing *Mooney* v. *Pickett*, *supra*, 4 Cal.3d 669.)

In *City of Lomita* v. *County of Los Angeles*, *supra*, 148 Cal.App.3d 671, the issue was whether the County could recover from cities located within the County the cost of providing ambulance services to the cities' indigent residents. The court stated: "It is now established that it is the statutory duty of a County to provide hospital and medical services to all indigent County residents. [Citation.]" (148 Cal.App.3d at p. 673, citing *County of San Diego* v. *Viloria*, *supra*, 276 Cal.App.2d at pp. 352-353.)[15] The court further concluded that "a County, obligated to provide emergency ambulance services to indigents, is free to select, for itself, the particular mode of compliance: it may operate its own services with its own ambulances; it may assign day-to-day operation to a sheriff, to a fire district, or set[]up some other department; or in lieu of providing ambulance service by its own employees, it may hire a city or other local agency or a private company to provide the service." (148 Cal.App.3d at pp. 673-674.)

In *Bay General Community Hospital* v. *County of San Diego*, *supra*, 156 Cal.App.3d 944, where a group of private hospitals protested the county's policy of refusing to accept transfers of stabilized indigent patients or to reimburse the private hospitals for the expense of caring for them, the court concluded that "[t]he no-transfer policy of the County is in derogation of the section 17000-imposed duty to care for indigent nonemergency resident ill persons who apply for admission to university hospital. . . . As between the

---

[15]*Viloria* involved the issue of whether the sponsor of a legal immigrant was responsible to the county for the cost of medical services provided to the immigrant. Citing section 17000 and Health and Safety Code section 1445, the court noted: "State law requires the County of San Diego to furnish hospitalization to an indigent person. [Citations.]" (*County of San Diego* v. *Viloria*, *supra*, 276 Cal.App.2d at p. 352.)

County and private hospitals, . . . the overall statutory scheme places the primary obligation to provide care to medically stabilized, indigent County residents on the County. The County's no-transfer policy therefore facially represents an impermissible exercise of section 17001 discretion in derogation of the County's mandate to provide medical care to indigent residents." (156 Cal.App.3d at pp. 957-958; see also *County of Alameda* v. *State Bd. of Control* (1993) 14 Cal.App.4th 1096, 1108 [18 Cal.Rptr.2d 487] ["Welfare and Institutions Code section 17000 imposes a mandatory duty upon all counties to provide 'medically necessary care,' not just emergency care. [Citation.]"], citing *Bay General Community Hospital* v. *County of San Diego, supra*, 156 Cal.App.3d at p. 957.)[16]

Although recognizing that a duty to provide medical care exists, few cases have explored or defined precisely what level of care is required. The exception is the case of *Cooke* v. *Superior Court* (1989) 213 Cal.App.3d 401 [261 Cal.Rptr. 706]. There, Butte County had refused to pay for any dental care for indigents other than reduction of oral or "maxillofacial" fractures and dislocations and treatment of abscesses through antibiotics, pain medication, and extraction. Plaintiffs suffered from numerous dental afflictions for which the county refused to provide treatment and sought a writ of mandate to compel the county to comply with its duties under sections 17000 and 10000, and former Health and Safety Code section 1442.5, subdivision (c). Defendant sought to justify its refusal to fund dental treatment for indigents by arguing that the statutes covered "basic survival" and healthy teeth were not necessary for basic survival. (213 Cal.App.3d at p. 414.) In determining the level of care required, the court first rejected petitioners' argument that they were entitled to the same care available to private patients under former subdivision (c) of section 1442.5 of the Health and Safety Code. The statute then provided in relevant part: "Notwithstanding the board's closing of a county facility, the elimination of or reduction in the level of services provided, or the leasing, selling, or transfer of management of a county facility subsequent to January 1, 1975, the county shall provide for the fulfillment of its duty to provide care to all indigent people, either directly through county facilities or indirectly through alternative means. . . . [¶] . . . [¶] Whether this duty is fulfilled directly by the county or through alternative means, the availability of services, and the quality of the treatment received by people who cannot afford to pay for their health care shall be the same as that available to nonindigent people receiving health care services in private facilities in that county."

The court concluded that section 1442.5 was irrelevant "because it is a limitation on a county's ability to close facilities or reduce services provided

---

[16]*County of Alameda* involved an attempt by a county to obtain recovery of medical expenses incurred on behalf of indigent victims of crimes from the Restitution Fund.

in those facilities" and "[t]he record before us tenders no claim that any county facility was closed nor that any services in any county facility were reduced." (*Cooke* v. *Superior Court*, *supra*, 213 Cal.App.3d at p. 410.) The court also rejected the contention that petitioners were entitled to the Medi-Cal standard of care which petitioners believed derived from the Legislature's elimination of medically indigent adults from the Medi-Cal program and transfer of funds to counties. The court noted that "section 16704 (allocation of funds from county health services fund), cited by petitioners, [states]: 'This section shall not be construed to mandate that a county provide any specific level or type of health care service . . . .' [Citation.]" (213 Cal.App.3d at p. 412, fn. omitted.) The court concluded: "This language in itself defeats petitioners' argument." (*Ibid.*)

The court in *Cooke* then addressed petitioners' contention that the level of care provided "forced them to live with untreated infection and chronic pain contrary to section 10000's command that relief be humanely administered." (213 Cal.App.3d at p. 413.) Initially, the court expressed sympathy for the county's predicament: "In considering this question, we are keenly aware of the fiscal plight of many counties within our jurisdiction. Counties have experienced severe economic hardships in the wake of Proposition 13. The effects of these hardships are well known: police, fire, and other services are curtailed; libraries close. Counties must find a way to provide many essential services while having only limited means of raising revenues with which to pay for them. For whatever reason, the Legislature has seen fit to place a large portion of the burden of caring for the indigent upon those units of government—the counties—least able to generate necessary revenues." (213 Cal.App.3d at p. 412, fn. omitted.) Nevertheless, the court concluded that "[i]n section 10000 the Legislature has decreed that counties must provide care 'humanely,' and it is this court's duty to give that declaration meaning." (213 Cal.App.3d at p. 414.) To that end, the court held that counties must, at a minimum, provide " 'medical care,' not just emergency care," and provide it at a level which "remedies the pain and infection which petitioners have needlessly endured." (*Id.* at pp. 414, 415, fn. omitted.)

The court had the opportunity to apply its holding immediately because, while the litigation was pending, the County had adopted a resolution which changed its standards for dental care. The resolution stated in pertinent part: " 'Dental services to be provided will be those procedures necessary to alleviate substantial pain, to treat infection, to maintain basic function, to maintain adequate nutrition, and to care for dental conditions which present a serious health risk.' [Citation.]" (*Cooke* v. *Superior Court*, *supra*, 213 Cal.App.3d at p. 416, citing Butte County Res. No. 89-011, § I-A.) The new resolution, the court determined, "provides a level of care sufficient to

satisfy the County's obligations under sections 10000 and 17000." (213 Cal.App.3d at p. 416.)

Turning to section 17001, the Supreme Court has interpreted it "to confer upon the county a broad discretion 'to determine eligibility for, the type and amount of, and conditions to be attached to indigent relief.' [Citations.]" (*Mooney* v. *Pickett, supra,* 4 Cal.3d at pp. 678-679, quoting *County of L. A.* v. *Dept. of Social Welfare* (1953) 41 Cal.2d 455, 458 [260 P.2d 41].) ██ The court added: "When a statute confers upon a state agency the authority to adopt regulations to implement, interpret, make specific or otherwise carry out its provisions, the agency's regulations must be consistent, not in conflict with the statute, and reasonably necessary to effectuate its purpose. [Citation.]" (*Mooney* v. *Pickett, supra,* at p. 679.)

██ It has been repeatedly held that section 17001 imposes an affirmative duty on the board of supervisors of each county to adopt standards of eligibility for aid and care for the indigent and dependent poor. (*Poverty Resistance Center* v. *Hart* (1989) 213 Cal.App.3d 295, 304 [261 Cal.Rptr. 545]; *Boehm* v. *County of Merced* (1985) 163 Cal.App.3d 447, 451 [209 Cal.Rptr. 530]; *City and County of San Francisco* v. *Superior Court* (1976) 57 Cal.App.3d 44, 47 [128 Cal.Rptr. 712].) "Such standards are in the nature of an administrative regulation." (*Poverty Resistance Center* v. *Hart, supra,* at p. 304; *Mooney* v. *Pickett, supra,* 4 Cal.3d at p. 679.) Courts have recognized that counties have a great deal of discretion in setting standards for eligibility and levels of aid.[17] "Nonetheless, the [county's] discretion can be exercised only within fixed boundaries and consistent with the underlying purpose of the statutes which impose the duty. [Citation.]" (*Boehm* v. *County of Merced, supra,* 163 Cal.App.3d at p. 451.) Courts have reviewed whether standards enacted by the counties under section 17001 were arbitrary and capricious (e.g., a regulation rendering unemployed men ineligible for aid as discussed in *Mooney*), promulgated without due consideration of relevant facts (e.g., regulations fixing the amount of aid enacted without consideration of the amount needed for subsistence living in the relevant county as discussed in *Boehm* and *Poverty Resistance Center*), or otherwise in conflict

---

[17]The court in *Bay General, supra,* which held that the county had not abused its statutory discretion by setting the financial eligibility standard for county care at the same level as the Medi-Cal financial eligibility standard, stated: "The Board of Supervisors is vested with broad discretion in setting eligibility standards (see § 17001). The County has not clearly and palpably violated the bounds of sound discretion in adopting the Medi-Cal standard for purposes of County-paid medical care under Section 17000. [¶] The County has not acted fraudulently, arbitrarily, or capriciously by defining indigency in the same way as does the state. A county's responsibility extends only to indigents as defined within its board of supervisors' sound discretion. While nothing precludes that definition from including the 'working poor,' nothing compels it either." (*Bay General Community Hospital* v. *County of San Diego, supra,* 156 Cal.App.3d at pp. 959-960, fn. omitted.)

with the statute (e.g., a regulation tying entitlement to county medical care to meeting the standards of Medi-Cal and leaving a private hospital which treated those ineligible for Medi-Cal or those who refused to apply without a source for reimbursement, as discussed in *Madera Community Hospital* v. *County of Madera* (1984) 155 Cal.App.3d 136 [201 Cal.Rptr. 768].) No court decision of which we are aware has required a county to enact written standards under section 17001 setting specific limits on waiting periods in order to comply with section 10000's reference to "prompt" provision of services or to enact any regulation relating to the level of care required by section 17000.

### III

With that background in mind, but before we address the specific question posed by the complaint, we turn to the County's argument that there is no need to reach the issue of whether standards for waiting times are required because various recent legislative actions have indicated a legislative intent to limit the open-ended obligation to provide medical care under section 17000 as set forth in the authorities discussed.

The County first argues that to the extent the authorities can be read to impose a minimum level of care under section 17000 and section 10000, they have been abrogated by Assembly Bill No. 1012 (1991-1992 Reg. Sess.) enacted as Statutes 1992, chapter 719, a 1992 legislative enactment which partially repealed a provision in the Health and Safety Code known as the Beilenson Act (Health & Saf. Code, § 1442 et seq.).

The Beilenson Act was designed to address the situation where a county hospital or other county medical facility was slated for closing. From the date of its enactment to the present, it has contained the following language: "Notwithstanding the board's closing of a county facility, the elimination of or reduction in the level of services provided, or the leasing, selling, or transfer of management of a county facility subsequent to January 1, 1975, the county shall provide for the fulfillment of its duty to provide care to all indigent people, either directly through county facilities or indirectly through alternative means." (former Health & Saf. Code, § 1442.5.) Assembly Bill No. 1012 repealed subdivision (c) of section 1442.5 of the Health and Safety Code, which had originally provided: "Whether this duty is fulfilled directly by the county or through alternative means, the availability of services, and the quality of the treatment received by people who cannot afford to pay for their health care shall be the same as that available to nonindigent people receiving health care services in private facilities in that county." The requirement that the quality of care be the same as that available to nonindigent people receiving health care services in private facilities was known as the community standard of care.

In the debate over Assembly Bill No. 1012, Senator Watson, an opponent of the bill, expressed concern that it would "eliminate any standard of care for county and state services given to the working poor of California" and that "[e]limination of the community standard means that counties will be allowed to provide second-rate or third-rate care to people just because they are poor . . . forc[ing] people to wait for months for services which might prevent them from getting sicker or even prevent them from dying." Senator Watson recommended "put[ting] a county standard in . . . a reference to the benefits that would be provided, the standards for access to the care, and the standards for medical necessity . . . any standard besides zero . . . ." In response, Senator Bergeson explained: "[E]ven with the elimination of the community standard of care, counties will still have an underlying obligation to provide indigent health care under 17,000. . . . And if you read that, you'll know that those requirements are still very much in order."

Senator Rosenthal sided with Senator Watson in the debate:[18] "If we repeal the Beilenson requirement for community standard of care . . . we have to have as a minimum what the counties have to provide, and I don't want to take for granted that because what is now in law in terms of 18,000 [presumably he meant 17000], that they're going to provide anything. [¶] It seems to me that at least we ought to provide a list of benefits to be provided, the standard for access to care, and the standard of medical necessity. If we don't have at least those minimums, then there's no guarantee that the county is going to provide anything. [¶] And so it seems to me that it's not enough to say that it's already in law . . . ." Senator Thompson pointed out "that the work that the working group did reflected in this measure specifically maintains the 17,000 provisions as they relate to health care . . . ." Senator Hill emphasized "how much of a compromise that we believe . . . this measure is. . . . [¶] . . . [W]e [legislators in his camp] wanted 17,000 repealed entirely whether it [applied] to the GA or whether it [applied] to the health side of the 17,000. . . . [¶] . . . [¶] Indeed this bill is a compromise. And there were concession[s] from our side of aisle, [and] concessions obviously from your colleagues."

These debates illustrate the infirmity in the County's position. As they reveal, the Legislature was well aware that section 17000 had been interpreted in the past to include a medical component and to impose a minimum standard of care below which the provision of medical services may not fall. Some legislators wanted section 17000 repealed and others wanted either to maintain the community standard or erect specific standards for the counties

---

[18]Interestingly, Senator McCorquodale expressed an opposite opinion, that the bill would change nothing because "there are innovative judges out there that can interpret this to mean that not only do they maintain the same standard, but they [the counties] don't get any relief."

in its place. Instead, the Legislature compromised by retaining section 17000, and its minimal standards, and repealing the higher community standard of former Health and Safety Code section 1442.5, subdivision (c). In so doing, the Legislature rejected the complete relief from standards of care proposed by certain legislators—and no doubt sought by the counties. The County cannot obtain a judicial repeal of section 17000 and the long line of precedent holding that section 17000 requires provision of medical services to the poor at a level which does not lead to unnecessary suffering or endanger life and health when the Legislature has specifically refused to grant that relief.

The County argues that there is significance to the fact that Assembly Bill No. 1012 repealed former sections 16995 and 16995.2. Section 16995 required counties receiving funds derived from Proposition 99 (the "Tobacco Tax" initiative) to refrain from imposing more stringent eligibility standards for receipt of benefits under section 17000 or to reduce the scope of benefits compared to those in effect on November 8, 1988. Section 16995.2 required counties to maintain at least the same number of outpatient visits in the 1989-1990 and 1990-1991 fiscal years as were provided in the 1988-1989 fiscal year. The County contends that by repealing those two provisions, the Legislature demonstrated an intent to allow counties to reduce benefits below those levels. We find more significance in the fact that the Legislature in enacting Assembly Bill No. 1012 chose to retain section 16995.1. Section 16995.1 provides: "Receipt of funding pursuant to this chapter shall not relieve a county of its obligation to provide indigent health care as required by Section 17000."[19] (Stats. 1989, ch. 1331, § 9, p. 5431.) Since, as we have discussed, the Legislature was aware of how section 17000 had been interpreted in the past, its decision to retain section 16995.1 with its specific acknowledgment of section 17000's requirements establishes that the Legislature did not intend for the counties to be relieved of their obligations thereunder.

The County next argues that an amendment to section 16990, another part of the Assembly Bill No. 1012 package, reveals a legislative intent to replace section 17000's open-ended requirement with a maximum dollar amount on the obligation to provide medical care. To support this argument, the County relies heavily on a statement made in *Gardner* v. *County of Los Angeles* (1995) 34 Cal.App.4th 200 [40 Cal.Rptr.2d 271]. To understand why the County's reliance on *Gardner* is misplaced, some additional background is required.

Section 17000.5, enacted in 1991, allows counties to "adopt a general assistance standard of aid, including the value of in-kind aid, that is 62

---

[19]Part 4.7, which includes section 16995.1, contains a "sunset provision" under which it will be repealed effective January 1, 1997, unless extended by a later statute. (§ 16997.1.)

percent of a guideline that is equal to the 1991 federal official poverty line . . . ." (§ 17000.5, subd. (a).) It states: "The adoption of a standard of aid pursuant to this section shall constitute a sufficient standard of aid." (§ 17000.5, subd. (b).) Section 17000.5 overruled a line of judicial authority, beginning with *Boehm* v. *County of Merced, supra,* 163 Cal.App.3d 447, which required a county's general assistance level to be based upon a factual study of the costs of basic subsistence in the county. Plaintiffs in *Gardner* were a class of indigent residents of the County, who protested a plan by the County to reduce its general relief cash grants from $293 per month to $212 per month by deeming the health care provided to meet its obligations under section 17000 to be "in-kind aid." Faced squarely with the issue of whether section 17000.5's reference to "aid" was meant to include medical care, the court in *Gardner* concluded that it did not. The court relied in part on prior case law which in requiring that the level of aid be based on studies of the costs of actual subsistence needs in each county had never said that health care costs must be part of the general assistance standard of aid. (*Gardner* v. *County of Los Angeles, supra,* 34 Cal.App.4th at pp. 213-216.) Put another way, when calculating the minimum amount that general assistance recipients were to be paid, the courts never required that the cost of medical care be included in that calculation. General assistance recipients were provided medical care in addition to the general assistance payment.

Further proof that the definition of "aid" in section 17000.5 was not intended to include medical care, the court concluded, could be found in the fact that as originally enacted in 1965, section 10052 proved that "aid" included "direct money payments, vendor payments and medical care." (*Gardner* v. *County of Los Angeles, supra,* 34 Cal.App.4th at p. 217; see Stats. 1965, ch. 1784, § 5, p. 3979.) In 1977, the Legislature amended section 10052, deleting the phrase "and medical care." (Stats. 1977, ch. 1252, § 715, p. 4630.) "In the context of the purposes and general effect of this legislation, it would seem that the intent and effect of the specific provision which deleted medical care from the definition of 'aid' as used in division 9 were to indicate that the provision of medical care through the Department of Health Services in cooperation with county departments of health services was to constitute a separate and distinct governmental function from the provision of 'aid' as a part of the counties' responsibilities under section 17000." (*Gardner* v. *County of Los Angeles, supra,* 34 Cal.App.4th at p. 218, fn. omitted; see *Dix* v. *Superior Court* (1991) 53 Cal. 3d 442, 461 [279 Cal.Rptr. 834, 807 P.2d 1063] ["We presume the Legislature intends to change the meaning of a law when it alters the statutory language . . . as for example when it deletes express provisions of the prior version . . . ."].)

The court was also persuaded by the fact that medical care and general assistance have always been wholly separate programs. It was in this portion

of the opinion that the court made the statement concerning section 16990 on which the County now relies. Section 16990 provides that every county which receives money from the California Health Care for Indigents Program account must maintain a specified level of financial support for health services, which amount is adjusted at the beginning of each fiscal year according to a formula provided in the statute. (See *Gardner* v. *County of Los Angeles*, *supra*, 34 Cal.App.4th at p. 219.) According to the court, Assembly Bill No. 1012 "amended section 16990 . . . to . . . reduce each county's financial obligation in fiscal 1991-1992 to reflect shortfalls in sales tax revenue and in county deposits in certain trust fund accounts, and . . . reduce each county's financial obligation in fiscal 1992-1993 by 7 percent (Stats. 1992, ch. 719 (Assem. Bill No. 1012) § 10) . . . ." (*Gardner* v. *County of Los Angeles*, *supra*, at p. 221, fn. 20.) "Read together," the court went on to say, "section 16990 and section 17000.5, which separately mandates a minimum [general assistance] standard, logically require counties *both* [italics original] to (1) fund medical services for the indigent at the levels specified in section 16990, and (2) provide the minimum amount of [general assistance] specified in section 17000.5. *These two requirements meet a county's two-part obligation under section 17000 to relieve and support the poor through assistance in securing the needs of basic survival and medically necessary health care services.*" (*Gardner* v. *County of Los Angeles*, *supra*, at p. 219, italics added.)

The County contends that the court in *Gardner* intended by that statement to mean that section 16990 provides a cap on the counties' obligation to provide medical care in the same way section 17000.5 provides a cap on their general assistance obligation. We do not believe that reading is justified. In *Gardner*, the court was faced with the question of whether section 17000.5's reference to "in-kind aid" allowed the County to deduct from relief checks the monetary value of medical services. The point the court was trying to make was that historically health care is "another program" separate from relief as evidenced by the fact that separate parts of the code govern the counties' health care and general assistance functions. No question concerning the level of medical services required by the statutes was raised in *Gardner*, nor was the court attempting to define it.

Moreover, had the court been attempting to say that section 16990 should be seen as a companion to section 17000.5, setting an upward limit on the amount the county must spend on medical care as section 17000.5 sets a limit on general assistance payments, we would be forced to disagree. Such an interpretation is not warranted by the plain language of the statute. Section 16990 provides: "Any county receiving an allocation pursuant to this chapter and Chapter 4 (commencing with Section 16930) shall, *at a minimum*, maintain a level of financial support of county funds for health

services at least equal to the total of the amounts specified in subparagraphs (A) and (B)." (Italics added.) A statute which by its express terms states the minimum the counties must provide cannot be read to set out the maximum. In contrast, section 17000.5 caps the counties' obligations by prescribing a *maximum* level of a monetary aid which they must provide, and expressly states: "The adoption of a standard of aid pursuant to this section shall constitute a sufficient standard of aid." (§ 17000.5, subd. (b).) If the Legislature had intended section 16990 to provide relief to the counties by capping the monetary value of medical services it was obligated to provide, it would have said so plainly, as it did in setting a maximum level of aid under section 17000.5.[20]

## IV

We now turn to the specific issue raised by the complaint: whether the statutes mandate the promulgation of formal written standards delineating maximum waiting times for patient care. As we have seen, section 17000 obligates the County to provide medical care. Section 17001 mandates "standards of aid and care," but does not specifically say that there must be standards regulating waiting periods or governing any other particular aspect of medical care. Section 10000 expresses the Legislature's intent that "aid shall be administered and services provided promptly and humanely . . . ," which has been interpreted to impose a minimum standard of care.

The County maintains that it does not need formal written standards in order to ensure that services be provided as required by the statutes. According to the declarations submitted in support of its motion, confirmed by statements of counsel at oral argument, when a person presents himself or herself at any facility, whether walk-in clinic or emergency room, there is an initial assessment by a medical professional as to what care is needed. Emergency conditions are dealt with in accordance with each hospital's triage standards. For nonemergencies, where follow-up care or referral is needed, the treating physician (or other health care professional) who undertakes the initial assessment and treatment can put a time limit on the waiting

---

[20]The County makes a similar argument based on section 17608.10 which provides: "As a condition of deposit of funds from the Sales Tax Account of the Local Revenue Fund into a county's or city's local health and welfare trust fund account, a county or city shall deposit county or city general purpose revenues into the health account each month equal to one-twelfth of the amounts set forth in the following schedule" and then gives a specific number for each county. The County argues that counties are "no longer required to demonstrate 'reasonable access' to 'necessary health care' under section 17000" and that this provision "changed county health mandates into a fiscal requirement." Section 17608.10 sets forth the minimum the County must contribute in order to receive revenues from a state fund. It cannot be read as a cap on section 17000's requirements.

period. According to the facts established by the County, and the statements of its counsel, the practice is to follow these recommendations. In other words, the County's position is that it recognizes its legal obligations and has met them by its practice and policy of treating patients when they have to be treated and seeing them when they have to be seen. As a result, it argues, no formal guidelines are necessary. Plaintiffs say they are pleased with the County's informal policy and practices, but insist that a formal standard should nonetheless be promulgated.

Not surprisingly, the question of whether a court can order a county board of supervisors to enact specific standards when the county already is operating in accordance with the wishes of the proponent of the standards is an unusual one not raised in any California appellate decision of which we are aware. ██ The general rule is that "[w]hen a writ of mandate is sought with respect to a governmental body," the court must "determine whether the act the writ seeks to compel is a legislative act, involving the exercise of discretion, or purely ministerial." (*United Assn. of Journeymen* v. *City and County of San Francisco* (1995) 32 Cal.App.4th 751, 759 [38 Cal.Rptr.2d 280].) This is because " '[A] court is without power to interfere with purely legislative action, in the sense that it may not command or prohibit legislative acts. . . .' [Citations.] If the underlying act involves the exercise of discretionary legislative power, the courts will interfere by mandamus only if the action taken 'is "so palpably unreasonable and arbitrary as to indicate an abuse of discretion as a matter of law." ' [Citation.]" (*Ibid.*, quoting *Monarch Cablevision, Inc.* v. *City Council* (1966) 239 Cal.App.2d 206, 211 [48 Cal.Rptr. 550]; and *Los Angeles City etc. Employees Union* v. *Los Angeles City Bd. of Education* (1974) 12 Cal.3d 851, 856 [117 Cal.Rptr. 537, 528 P.2d 353].)

Unless the governing statutes specifically call for formal regulation in a particular area, the decision of when or whether to undertake the promulgation of formal regulations is a discretionary one. (See *Agricultural Labor Relations Board* v. *Superior Court* (1976) 16 Cal.3d 392, 413 [128 Cal.Rptr. 183, 546 P.2d 687].) Federal courts facing similar issues, where a petitioner seeks to compel rulemaking under the Administrative Procedures Act (5 U.S.C. § 552 et seq.), have concluded that "the decision to institute rulemaking is one that is largely committed to the discretion of the agency, and . . . the scope of review of such a determination must, of necessity, be very narrow." (See *WWHT, Inc.* v. *F.C.C.* (D.C. Cir. 1981) 656 F.2d 807, 809 [211 App.D.C. 218].) It is said that an agency decision not to institute rulemaking should be overturned "only in the rarest and most compelling circumstances." (*Ibid.*; *Western Fuels-Illinois, Inc.* v. *I.C.C.* (7th Cir. 1989) 878 F.2d 1025, 1027; accord, *U.S.* v. *Articles of Banned Hazardous Substances* (2d Cir. 1994) 34 F.3d 91, 98.) Where the question is one of forcing

an agency to formally publish an existing practice or policy, "'the courts have consistently required that agencies publish their rules and policy statements only if they constitute a change from existing law, policy or practice.' [Citations.]" (*Dilley* v. *National Transp. Safety Bd.* (10th Cir. 1995) 49 F.3d 667, 670, fn. 6, quoting *Knutzen* v. *Eben Ezer Lutheran Housing Center* (10th Cir. 1987) 815 F.2d 1343, 1351, and cases cited therein.) This is in line with the principle that an agency "is not required to address an issue in the regulations that Congress has already addressed in the statute. [Citation.]" (*U.S.* v. *Articles of Banned Hazardous Substances, supra,* 34 F.3d at p. 98; accord, *Miller* v. *Claytor* (N.D.Cal. 1979) 466 F.Supp. 938, 941 ["[I]t is settled that an administrative agency is not required to promulgate detailed rules translating provisions governing its actions. [Citations.]"].)

California has its own version of the Administrative Procedure Act (APA). (See Gov. Code, § 11370, describing the APA as consisting of "Chapter 3.5 (commencing with Section 11340), Chapter 4 (commencing with Section 11370), Chapter 4.5 (commencing with Section 11400), and Chapter 5 (commencing with Section 11500) . . . .") It has recently been amended to require the Office of Administrative Law to review all regulations adopted to ensure that they are necessary and nonduplicative, "nonduplication" being defined to mean that the regulation does not serve the same purpose as a state or federal statute or other regulation. (Gov. Code, § 11349, subd. (f); *id.* § 11349.1, subd. (a).) That provision was discussed in *Engelmann* v. *State Bd. of Education* (1991) 2 Cal.App.4th 47 [3 Cal.Rptr.2d 264], where the court was primarily concerned with whether or not application of the APA to the state Board of Education would violate the separation of powers doctrine through legislative interference with the board's constitutional authority to select textbooks. There the court stated: "If certain policies and procedures contained in the 1988 publication are, as the Board asserts, 'essentially[] a reiteration of the extensive statutory scheme which the Legislature has established' in the Education Code, then there is obviously no duty on the part of the Board to enact regulations to cover such reiterations, since the sixth commandment of 'nonduplication' prescribes 'that a regulation does not serve the same purpose as a state . . . statute . . . .'" (2 Cal.App.4th at p. 62, quoting Gov. Code, § 11349, subd. (f).)

■ Although neither the federal authority nor the California APA is directly relevant, each expresses applicable principles which guide our decision. Section 17000, as authoritatively interpreted, mandates that medical care be provided to indigents and section 10000 requires that such care be provided promptly and humanely. The duty is mandated by statute. There is no discretion concerning whether to provide such care—and no need to enact regulations reiterating the obligation. At the same time, the statutes

give the counties a great deal of discretion in determining how best to meet the medical needs of indigent residents in light of the limited resources available. Achieving the mandated level of care requires the exercise of considerable discretion as the County chooses between a multitude of potential courses of action. In accordance with the discretion afforded, it may choose to adopt formal guidelines or to proceed on a less formal basis. Our role is to determine whether the County has abused or exceeded its discretion under the governing statutes—not to dictate how that discretion must be exercised.

The County, faced with the question of how to allocate scarce resources to ensure that indigents receive the minimal care required under the statutes, has determined that the appropriate way to deal with the problem of backlogs is to let each individual hospital and clinic determine scheduling guidelines. It has put into place procedures and practices geared toward ensuring that patients be promptly assessed and treated in accordance within the time frame deemed necessary by the medical professional who performs the initial assessment. At this point, we cannot say the County has failed to fulfill a statutory mandate or abused the discretion granted to it by failing to enact formal written standards.

V

DISPOSITION

The judgment is affirmed. Each party to bear its own costs.

Vogel (C. S.), P. J., and Epstein, J., concurred.

A petition for a rehearing was denied September 18, 1996, and the opinion was modified to read as printed above.