[No. D048758. Fourth Dist., Div. One. May 23, 2007.]

DOROTHEA RENEE ALFORD et al., Plaintiffs and Appellants, v. COUNTY OF SAN DIEGO et al., Defendants and Respondents.

## COUNSEL

Western Center on Law and Poverty, Richard A. Rothschild, Robert D. Newman, Catherine S. Murphy; Fish & Richardson and Lara S. Garner for Plaintiffs and Appellants.

John J. Sansone, County Counsel, C. Ellen Pilsecki and Timothy M. Barry, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**NARES, Acting P. J.**—The Legislature, in Welfare and Institutions Code[1] section 17000, requires that "[e]very county and every city and county shall relieve and support *all* incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions." (Italics added.)

The California Supreme Count has interpreted this statute as imposing a mandatory duty to provide a system of "last resort" subsistence medical care, a level of care which does not lead to unnecessary suffering or endanger life and health, to all medically indigent residents who do not have the financial ability to pay all or some of the costs of such treatment and are not eligible for other state or federal aid—in most cases, the "working poor." (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 1012–1015 [90 Cal.Rptr.2d 236, 987 P.2d 705] (*Hunt*).)

In this case, the trial court approved San Diego County's (the County) financial eligibility standard for such medical care, which denies any services for individuals who earn more than $1,078 per month. The eligibility standard also limits the provision of subsistence medical care to residents who have

---

[1] All further statutory references are to the Welfare and Institutions Code.

assets of $2,000 or less. The plaintiffs in this action (the plaintiffs), a group of County residents who were denied care for their serious injuries and illnesses because their incomes were slightly above the County's eligibility cap, and were uninsured and either had limited or no ability to pay for medical treatment, assert that the court erred in approving the County's financial eligibility cap because (1) in approving that cap it did not consider individual residents' ability to pay all or part of the actual cost of such care; and (2) the cap was based upon legally flawed assumptions and was not supported by substantial evidence.

We conclude that because the County's eligibility standard is based upon an inflexible income cap that denies any medical care to indigent residents, in particular the working poor, whose monthly salary exceeds that cap by even $1, without consideration of their ability to pay for some or all of their medical care, the eligibility standard is void and the judgment is reversed. Based upon this holding, we need not decide whether any or all of the challenged monthly expenditures that comprised the monthly income eligibility cap are supported by substantial evidence.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  County's Indigent Health Care Program

Pursuant to section 17000, the County provides medical care to poor persons, aged 21 to 64, through the County Medical Services program (CMS). CMS delivers care to the indigent through contracts with private hospitals clinics and health centers. To qualify for CMS, a person must have "serious health problems," must be a resident of the County, and must have countable income and resources within CMS limits. As the County's program overview states, "CMS is the County's safety net program covering adults who are not eligible for Medi-Cal."

Prior to 1987, an individual whose income exceeded the applicable CMS limit would still be eligible for medical treatment as long as the individual paid for a portion of the cost of that care. In 1987, however, the County eliminated this provision and imposed an income cap of $734 a month for an individual and $867 a month for a family of two. When an applicant's income exceeded this set amount, he or she was ineligible for medical care under CMS, regardless of the individual's ability to pay for such care.

At the time this action was filed in 2005, the eligibility limit was $802 for an individual and $1,084 for a family of two. The resource (assets) limit was $2,000 for an individual and $3,000 for a family of two.

B. *The Plaintiffs*

In January 2005 plaintiffs filed this class action lawsuit to challenge the CMS eligibility cap. The complaint alleged that the lead plaintiff, Dorothea Renee Alford, was employed as a maintenance worker for a church camp, where she earned $649 per month and received free room and board. Her employer indicated on her paycheck that the value of her room and board was $539 per month.

In February 2004 Alford, experiencing pain and bleeding, was admitted by a hospital emergency room, where she was diagnosed with lymphoma. Unable to afford further treatment, she applied for CMS medical care but was denied care because her $649 salary, combined with the value of her room and board, exceeded the $802 cap. Alford asked whether she would be eligible if she paid a part of the cost of the treatment. She was told no.

At the time Alford applied for CMS benefits, her doctors told her that her tumors were 85 percent treatable. Eight months later, her untreated tumors had become inoperable.

The other named plaintiffs also suffered from serious medical conditions, but because their income exceeded the $802 cap they were rejected by CMS for coverage. Eric Bromberg (Bromberg) suffers from diabetes and valley fever, a fungal infection that usually spreads to the lungs. He suffered a viral infection in a lung that required surgery to remove 10 percent of that lung. However, because his income exceeded the cap by $86.78, he was denied CMS care. As a result, he has incurred medical bills totaling more than $200,000 that he is unable to pay.

Brian Byrnes is disabled and cannot work due to injuries suffered in an accident. He was hospitalized for a staph infection and had emergency rotator cuff surgery. He was denied CMS benefits because his monthly disability benefits exceeded that income cap by $202. As a result, he has incurred $30,000 in medical bills.

Eric Pate was admitted to the emergency room after suffering a stroke and lying alone and immobile in his apartment for over a day. He was denied CMS benefits because his income from unemployment insurance was $202 over the income eligibility cap. As a result, Pate has incurred approximately $250,000 in medical bills.

Richard Edmiston, a self-employed dump truck driver, was admitted to a hospital emergency room with heart failure. He was denied CMS because his income exceeded the cap by $1,231. As a result, he has incurred $32,000 in

medical bills that he cannot pay, and he has no means to meet his health care needs. Additional named plaintiffs were added to the complaint so that by the time of the proceedings below there were 20 named plaintiffs.

### C. *Administrative Hearings and Lawsuit*

The plaintiffs challenged their denial of CMS benefits by requesting and receiving administrative hearings. The hearing officer ruled against them, upholding the income eligibility limit.

The plaintiffs then filed a petition for writ of mandate and complaint for injunctive and declaratory relief in the superior court, seeking to invalidate the $802 income cap. In April 2005 Bromberg moved for a preliminary injunction to prevent the County from denying him medically necessary care based on a standard that did not consider his ability to pay.

### D. *Injunction*

The court granted the injunction, finding that Bromberg suffered from "acute life-and-limb threatening conditions: . . . diabetes and Valley Fever, a fungal infection [that] usually spreads to the lungs." The court found that the County's clinics that were open to non-CMS-eligible individuals such as Bromberg "are inadequate for patients who require specialty care." As a result, Bromberg was "not receiving all the medical care he needs."

The court found that the County's use of a " 'bright-line' income cap" was improper "without considering the individuals' ability to pay the costs of necessary care." Because the County had not considered Bromberg's ability to pay before denying him CMS care, the court found that he had "established a probability of prevailing on the merits" and granted the injunction. Thereafter, on instructions from the court, the parties negotiated an agreement under which the County agreed to provide CMS coverage for Bromberg, and in return he would pay $100 per month as his share of the cost of his treatment.

### E. *Class Certification*

The plaintiffs filed motions seeking to certify a class. The court granted class certification as to the causes of action seeking a writ of mandate, declaratory relief and injunctive relief. The class consisted of all County residents who, since January 24, 2004, have been or will be denied CMS because of current income caps or because of any other policy that does not consider the applicants' ability to pay for subsistence medical services.

### F. Court's Grant of Writ of Mandate

In November 2005 the court granted plaintiffs a peremptory writ of mandate invalidating the County's $802 individual and $1084 household-of-two income caps. Citing the California Supreme Court's decision in *Hunt, supra*, 21 Cal.4th at page 1012, the court noted that section 17000 "requires the County to take into account the financial ability of residents to obtain subsistence medical care" and that a county "may not condition the receipt of health care upon a financial eligibility standard that fails to consider individual residents' ability to obtain necessary care." The court found that "the County's current program of limiting County medical services to those with a certain income level, without taking into account the factors enumerated in [section] 17000, does not satisfy the County's duty to provide subsistence medical care." The court stated it would issue a writ "directing the County Board of Supervisors to adopt eligibility standards that consider *the individual residents' ability to obtain necessary care*." (Italics added.)

In December 2005 judgment was entered in plaintiffs' favor and a writ of mandate was issued. Consistent with its November order granting plaintiffs' writ, the writ of mandate commanded the County to "submit to the Court new income eligibility standards that comply with [sections] 17000 and 10000, and that base eligibility for indigent health care on *the individuals' ability to pay for such care*." (Italics added.) The County did not appeal from the judgment.

### G. County's Efforts to Comply with Judgment.

In response to the court's writ of mandate the County's chief administrative officer submitted to the County Board of Supervisors a proposal to raise the maintenance need level to 135 percent of the federal poverty level or $1,078 for a single individual.[2] To arrive at this amount, County staff prepared a study of subsistence costs of living in the County. In determining the local cost of living, the County included housing (including utilities), food, transportation, health care costs, clothing, personal care, and household supplies.

As to housing, the County surveyed studio and one-bedroom apartments that rent for less than $800 per month. The study determined that the average rent for the housing units, including utilities, was approximately $497 per month.

---

[2] The federal poverty level, established in the 1960's, was initially calculated as the subsistence cost of food multiplied by three. The resulting levels have since been adjusted annually to reflect changes in the consumer price index. (*Gardner v. County of Los Angeles* (1995) 34 Cal.App.4th 200, 219, fn. 18 [40 Cal.Rptr.2d 271].)

For food, the County utilized a "low-cost" food plan level under United States Department of Agriculture statistics. Based upon their calculations, the County arrived at a number of $204 per month as the cost of food for an individual in the County.

For transportation, the County found that because it concluded that 96 percent of the targeted population lived within two miles of public transportation, it was reasonable to use the $60 monthly Metropolitan Transit System pass as the monthly transportation cost. The County allocated $58 per month for clothing and personal care items, and $29 per month for household expenses.

The County allocated $225 per month for health care costs, which consisted of health insurance, medical supplies, over-the-counter medications and unreimbursed costs for medical care. The health insurance component of that amount was $119.

Based upon these numbers, County staff submitted to the Board a proposal to raise the maintenance need level to $1,078 for a single individual. Residents whose income was above the $1,078 cap, as before, would be denied any medical care from CMS. As to those whose income exceeded the $1,078 cap, the proposal stated that it "assumed that any excess income could be used to pay for basic health insurance or medically necessary health care." The County maintained its $2,000 property ownership cap.

### H. *Plaintiffs' Opposition to Proposed Cap*

Plaintiffs opposed the new proposed limits. They argued that the County should not adopt an inflexible cap that did not consider those with a limited ability to pay and also that the $1,078 cap was not an accurate measurement of residents' ability to pay.

Plaintiffs disputed the assumptions the County used to come up with the $497 monthly rent amount, submitting a declaration from their expert who opined that "there are, at most, a few hundred housing units available [in the County] at $497 to CMS applicants at any given time, if they can find them." He also disputed the County's assumption that chronically ill low- income adults could find roommates from an online classified advertising service that specialized in serving college students.

As to the $60 transportation allowance for a bus pass, plaintiffs' transportation expert stated that it was "unreasonable to use a standard of two miles from public transportation to measure 'availability' of public transit." Rather, transportation planners use one-quarter to three-eighths of a mile as the

standard for a reasonable walking distance. He opined that low-income residents in poor health, such as CMS applicants, are unlikely to walk up to four miles each day to get to work or health clinics. He also stated only 5 percent of low-income residents of the County use public transportation. Therefore, a more reasonable allowance based upon what low-income residents actually spend for transportation would be $259.69 per month, the average lowest income (20 percent) as reported by the Consumer Expenditure Survey (CES), adjusted for higher living costs in San Diego.[3]

Plaintiffs contested the $225 monthly allocation for health care. They questioned the County's reliance on a CES study that averaged in costs of people whose health insurance was paid by their employers or the government, and therefore have little or no health care expenses. The survey did not measure what health care would cost the plaintiffs' class, which was uninsured. Plaintiffs' experts testified that health care costs for the least expensive policy would be well over $300 a month, and for those who cannot afford insurance or are denied coverage, monthly expenses could be $650 to $1,430 per month.

Plaintiffs contested the County's assumption that those with income above the $1,078 cap, who therefore would be ineligible for medical care, could use any excess income "to pay for basic health insurance or medically necessary health care." They submitted declarations from class members who were denied CMS care, but who also could not afford insurance or medical care. They also submitted evidence from their experts who stated that insurance is usually unavailable for many CMS applicants, who have preexisting conditions. When available, it is financially out of reach for such persons.

Plaintiffs presented evidence that without insurance, class members could only afford a small portion of the health care they needed. For example, Bromberg was forced to skip necessary doctor visits, test his blood less often than recommended, and could not afford X-rays, which cost $500 to $600, or medication to treat his valley fever, which cost $1,000 per month. Class member Steven Moskowitz, who already owed over $20,000 in medical bills, could not get followup treatment for a spot on his lung that his doctor thought might be cancerous.

I. *Board of Supervisors Adopts $1,078 Cap*

The County Board of Supervisors adopted the proposed $1,078 cap. This left in place the policy of denying care to anyone exceeding the cap, regardless of their ability to pay for a portion of that care.

---

[3] The CES was used by the County for other components of the $1,078 cap.

### J.  Court's Approval of $1,078 Cap

The County filed a return to the writ seeking court approval of its $1,078 income cap. Plaintiffs moved to enforce the judgment, contending the new cap was invalid and illegal because (1) the County could not deny care to persons whose incomes exceeded the cap without considering their ability to pay some or all of their care; and (2) the $1,078 number was based upon flawed assumptions, was unsupported by the evidence, and was too low given the costs of the necessities of life.

Plaintiffs relied upon the administrative record and a declaration from class member Maria Penney, who suffered from diabetes, thyroid disease, high blood pressure and "rotten teeth." The County objected to the Penney declaration as outside the administrative record, but the court agreed to consider it "for the purpose of illustrating the problem with the cap."

Penney declared that she originally applied for and was approved for CMS after she went into a diabetic coma because she could not afford insulin. However, when her health improved and she regained her job as a cashier in a gas station, she was denied CMS care because she was "one dollar over the CMS income limit." As a result, she was forced to charge her medical visits, insulin and other medical supplies on her credit card. She stopped going to her doctor and receiving blood work as often as her doctor required and experienced headaches from pain in her mouth because she could not afford dental care.

The court approved the $1,078 income cap and discharged the writ. In doing so, the court first rejected plaintiffs' argument that the applicable law "specifically and categorically precludes a standard based on a flat amount of income." The court also found that "the factual premises relied upon by the Board in setting the [caps] are reasonably supported by the evidence before the Board."

The court also rejected plaintiffs' contention that the County must provide subsistence medical care to indigent persons who are able to pay only some of their medical costs. However, in doing so, the court noted that such a policy "would be consistent with the policies behind [section 17000]; however, absent a specific directive from either the legislature or a higher court, this court lacks the authority to accomplish this worthwhile goal." At oral argument, the court stated, "I think it's a great case for an appeal and I can see an appellate court siding with you on this, but as a trial judge, I think I have to go with what the courts have done."

This appeal follows.

## DISCUSSION

The plaintiffs assert that the court erred in approving the County's $1,078 monthly income cap because (1) in approving that cap it did not consider individual residents' ability to pay all or part of the actual cost of such care; and (2) the cap was based upon legally flawed assumptions and was not supported by substantial evidence. We conclude that because the County's eligibility standard is based upon an inflexible income cap that denies any medical care to indigent residents, in particular the working poor, whose monthly salary exceeds that cap by even $1, without consideration of their ability to pay for some or all of their medical care, the eligibility standard is void; and the judgment is reversed. Based upon this holding, we need not decide whether any or all of the challenged monthly expenditures that comprised the monthly income eligibility cap were supported by substantial evidence.

### A.  *Standard of Review*

" 'The standard of judicial review of agency interpretation of law is the *independent judgment* of the court, giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action.' [Citation.]" (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 8 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) "[T]he binding power of an agency's *interpretation* of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (*Id.* at p. 7.) To the extent we are resolving factual issues, we utilize the substantial evidence standard of review. (*Scates v. Rydingsword* (1991) 229 Cal.App.3d 1085, 1101 [280 Cal.Rptr. 544].)

### B.  *Section 17000*

"Section 17000 imposes upon counties a mandatory duty to 'relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident,' when those persons are not relieved and supported by some other means. [Citation.] . . . [S]ection 17000 'creates "the *residual* fund" to sustain indigents "who cannot qualify . . . under any specialized aid programs." [Citations.]' [Citation.]" (*Hunt, supra,* 21 Cal.4th at p. 991, fn. omitted, italics added by *County of San Diego v. State of California* (1997) 15 Cal.4th, 68, 92 [61 Cal.Rptr.2d 134, 931 P.2d 312] (*County of San Diego*).) This is a program of " 'last resort.' " (*County of San Diego, supra,* at p. 92.)

Moreover, as the California Supreme observed in *County of San Diego, supra*, 15 Cal.4th at pages 104–105, section 17000 " 'imposes a mandatory duty upon all counties to provide "medically necessary care," not just emergency care,' " to county indigents who have no other means to care for themselves. In *Tailfeather v. Board of Supervisors* (1996) 48 Cal.App.4th 1223, 1240 [56 Cal.Rptr.2d 255] (*Tailfeather*), the Court of Appeal observed that "section 17000 requires provision of medical services to the poor at a level which does not lead to unnecessary suffering or endanger life and health . . . ."

■ "Section 17001 requires each county to 'adopt standards of aid and care for the indigent and dependent poor.' " (*Hunt, supra*, 21 Cal.4th at p. 991, fn. omitted.) This provision "confer[s] upon the county a broad discretion 'to determine eligibility for, the type and amount of, and conditions to be attached to indigent relief.' [Citations.] [¶] This discretion, however, can be exercised only within fixed boundaries. . . . ■ When a statute confers upon a state agency the authority to adopt regulations to implement, interpret, make specific or otherwise carry out its provisions, the agency's regulations must be consistent, not in conflict with the statute, and reasonably necessary to effectuate its purpose. [Citation.]" (*Mooney v. Pickett* (1971) 4 Cal.3d 669, 678–679 [94 Cal.Rptr. 279, 483 P.2d 1231] (*Mooney*).) " '[D]espite the counties' statutory discretion, "courts have consistently invalidated . . . county welfare regulations that fail to meet statutory requirements. [Citations.]" [Citation.]' [Citation.]" (*Hunt, supra*, 21 Cal.4th at pp. 991–992.)

Thus, the counties' eligibility and service standards must "carry out" the objectives of section 17000. (*Mooney, supra*, 4 Cal.3d at p. 679; see also *Poverty Resistance Center v. Hart* (1989) 213 Cal.App.3d 295, 304–305 [261 Cal.Rptr. 545, 271 Cal.Rptr. 214]; § 11000 ["provisions of law relating to a public assistance program shall be fairly and equitably construed to effect the stated objects and purposes of the program"].) The policy behind section 17000 is stated in section 10000, which provides: "The purpose of this division is to provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to *all* of its needy and distressed. It is the legislative intent that aid shall be administered and services provided promptly and humanely, with due regard for the preservation of family life, and without discrimination on account of race, national origin or ancestry, religion, sex, marital status, or political affiliation; and that *aid shall be so administered and services so provided*, to the extent not in conflict with federal law, *as to encourage self-respect, self-reliance, and the desire to be a good citizen, useful to society*." (Italics added.)

County standards that fail to carry out section 17000's objectives "are void and no protestations that they are merely an exercise of administrative discretion can sanctify them." (*Morris v. Williams* (1967) 67 Cal.2d 733, 737 [63 Cal.Rptr. 689, 433 P.2d 697].) Courts, which have " 'final responsibility for the interpretation of the law,' " must strike them down. (*Id.* at p. 748.)

### C.  *Indigents with Limited Ability to Pay for Medical Services (Working Poor)*

As will be explained in this section, courts have long concluded, under both the common law and section 17000, that a county's obligation to provide subsistence medical care to the poor includes not only those with no ability to pay, but also those with a limited ability to pay, sometimes referred to as the "working poor."

In *Goodall v. Brite* (1936) 11 Cal.App.2d 540 [54 P.2d 510] (*Goodall*), a taxpayer sought to enjoin the board of supervisors from admitting certain classes of patients to the county hospital, i.e., those patients who could pay for only part of the cost of their hospitalization. The *Goodall* court concluded that it was a proper exercise of the county's police powers to admit and treat such patients. In *Goodall,* the court held that a county hospital may not limit admission to only "the pauper class" (*id.* at p. 549); it must also accept those "who cannot pay for hospitalization in private institutions but who can pay something towards their care and treatment," i.e., the medically indigent. (*Id.* at p. 548.) As the *Goodall* court stated: "We can visualize the head of a family who has employment and can keep it,—an honest worker, frugal and thrifty, who supports his family, educates his children and has perhaps acquired an equity in a modest home. If he is injured, not in the course of his employment, the family income stops and he may require hospitalization and may lack the funds with which to enter a private institution. Must it be said that he should be refused admission to the county hospital because he is not a pauper when if he were a pauper he would be admitted without question? This would amount to the penalizing of honest industry, thrift and independence and would place a premium on indolence and shiftlessness. Under the principles of humanitarianism, and in the interest of a sound policy, we are compelled to hold that a patient in need of hospitalization, who cannot himself, or through legally liable relatives, pay the charges of a private institution, should be admitted to the county hospital because the care of such sick or injured promotes the public health and general welfare of the community in which he lives." (*Id.* at p. 549.)

In *County of San Diego v. Viloria* (1969) 276 Cal.App.2d 350, 352 [80 Cal.Rptr. 869] (*Viloria*), a case involving the issue of whether the sponsor of a legal immigrant was responsible to the County for the cost of medical services provided to the immigrant, we stated that section 17000 "requires the County of San Diego to furnish hospitalization to an indigent person. [Citations.] *In the event the indigent person is able to pay a part of although not the total charge for hospital services rendered him by the county, he is obligated accordingly.* [Citation.] The county is authorized to fix the rate to be charged the indigent and to direct its collection. [Citation.] Nevertheless, *the obligation is limited in amount to the extent of the indigent person's ability to pay.* [Citation.]" (*Viloria, supra,* 276 Cal.App.2d at p. 352, italics added.) In reaching this conclusion, we relied upon and cited *Goodall* with approval. (*Ibid.*)

In *County of San Diego, supra,* 15 Cal.4th 68, the California Supreme Court discussed the fact that, pursuant to 1982 legislation, the state withdrew from counties Medi-Cal funding for medically indigent persons. (*Id.* at pp. 79–80, fn. omitted.) To offset this change in coverage, the state set up an account as a mechanism to transfer state funds to counties to pay for Medi-Cal expenses, and sufficient funds had been available in this account to enable the state to fully fund the County's Medi-Cal costs. (*Id.* at p. 80.) However, in fiscal year 1990–1991, insufficient funds were available. (*Ibid.*) The state argued that no mandate for reimbursement existed because the counties had always borne the responsibility of paying for indigent medical care under section 17000. (*County of San Diego, supra,* at pp. 91–92.) The Supreme Court rejected this contention, finding reimbursement was mandated because in enacting Medi-Cal the Legislature had shifted the cost of indigent medical care from the counties to the state. (*Id.* at pp. 96–97.) Given this background, the Legislature excluded medically indigent persons from Medi-Cal, knowing that it would trigger the counties' obligation to pay for medical care as providers of last resort. (*Id.* at p. 98.) Therefore, the 1982 legislation "mandated a ' "new program" ' on counties by 'compelling them to accept financial responsibility in whole or in part for a program,' i.e., medical care for adult [medically indigent persons] . . . ." (*Ibid.*)

The state argued that "because San Diego had statutory discretion to set eligibility and service standards [under section 17000], there was no reimbursable mandate." (*County of San Diego, supra,* 15 Cal.4th at p. 99.) In rejecting this argument the court stated that the state exaggerated the scope of a county's discretion, concluding that it must provide subsistence medical care to *all* medically indigent persons. (*Id.* at pp. 100–103.) The high court also expressly disapproved *Bay General Community Hospital v. County of San Diego* (1984) 156 Cal.App.3d 944 [203 Cal.Rptr. 184] (*Bay General*) "insofar

as it (1) states that a county's responsibility under section 17000 extends only to indigents as defined by the county's board of supervisors, and (2) suggests that a county may refuse to provide medical care to persons who are 'indigent' within the meaning of section 17000 but do not qualify for Medi-Cal." (*County of San Diego*, at p. 101, fn. 23.) In reaching this conclusion the high court also pointed to the Legislature's rejection of an amendment limiting the scope of section 17000's coverage, in particular the Assembly Committee on Health statement that the amendment " 'cannot remove the fact that counties are, by definition, a "last resort" for any person, *with or without the means to pay,* who does not qualify for federal or state aid.' " (*County of San Diego, supra,* 15 Cal.4th at p. 103, italics added.)

In *Hunt, supra,* 21 Cal.4th 984, the California Supreme Court rejected Sacramento County's flat income eligibility cap for providing subsistence medical care to the medically indigent. Sacramento County originally provided free health care to individuals with income up to $600 per month. Individuals with income exceeding that amount also were eligible to receive health care, but they were required to pay a share of the cost. (*Id.* at p. 994.) Because Sacramento County faced budget shortfalls in 1992, it amended its financial eligibility standard to be the same as the eligibility standard for general assistance (GA) under section 17000.5.[4] Under the amended standard, Sacramento County provided no medical care to residents who did not meet the financial eligibility requirements for general assistance, subject to limited exceptions. At that time, an individual living alone was eligible for general assistance if his or her income did not exceed $294 per month—an amount equal to 62 percent of the 1991 federal official poverty line. (21 Cal.4th at p. 994.)

A class action was filed seeking to halt Sacramento County's amended standard. (*Hunt, supra,* 21 Cal.4th at p. 995.) The plaintiffs were identified as "low-income county residents who rely upon the County for vital health care, such as treatment for cancer, epilepsy, and hypertension, but who are ineligible for health care under the amended standard." (*Ibid.*) The trial court granted a preliminary injunction in the plaintiffs' favor precluding Sacramento County from denying their medical services "solely because they do not meet the general assistance financial eligibility standard, or any other

---

[4] Section 17000.5 provides in part: "The board of supervisors in any county may adopt a general assistance standard of aid, including the value of in-kind aid which includes, but is not limited to, the monthly actuarial value of up to forty dollars ($40) per month of medical care, that is 62 percent of a guideline that is equal to the 1991 federal official poverty line and may annually adjust that guideline in an amount equal to any adjustment provided under Chapter 2 (commencing with Section 11200) of Part 3 for establishing a maximum aid level in the county. This subdivision is not intended to either limit or expand the extent of the duty of counties to provide health care."

eligibility standard that [failed] to consider plaintiffs' financial ability to meet their subsistence medical needs." (*Ibid.*)

Sacramento County later requested that the court dissolve the injunction, based upon its decision to provide all subsistence needs to indigents, including medical care, solely by providing GA cash grants calculated under section 17000.5. (*Hunt, supra,* 21 Cal.4th at p. 995.) It also had adopted an alternative, contingent plan, should its new plan not be judicially approved, that would make an individual eligible for medical care if his or her monthly income was $439 or less per month. (*Id.* at pp. 995–996.) The trial court denied Sacramento County's motion to dissolve the injunction and on appeal that decision was reversed. (*Id.* at pp. 996–997.)

■ The plaintiffs petitioned for review and the California Supreme Court reversed the Court of Appeal's decision. In doing so, the high court rejected Sacramento County's "contingent" eligibility standard that barred medical care for individuals whose income exceeded $439 a month, regardless of whether the resident would be able to obtain subsistence medical care. (*Hunt, supra,* 21 Cal.4th at pp. 1010–1011.) The Supreme Court also noted that, in *County of San Diego, supra,* 15 Cal.4th 68, it had overruled *Bay General, supra,* 156 Cal.App.3d 944, " 'insofar as it (1) states that a county's responsibility under section 17000 extends only to indigents as defined by the county's board of supervisors, and (2) suggests that a county may refuse to provide medical care to persons who are "indigent" within the meaning of section 17000 but do not qualify for Medi-Cal.' " (*Hunt, supra,* 21 Cal.4th at p. 1012.) The California Supreme Court struck down the eligibility standard "because it fails to take into account the financial ability of residents to obtain subsistence medical care." (*Ibid.*) Because " 'counties are, by definition, a "last resort" for any person, *with or without the means to* pay, who does not qualify for federal or state aid,' " "in determining a financial eligibility standard for county health services pursuant to section 17000, *the County must consider whether implementation of the standard would leave some residents who are incapacitated by age, disease, or accident, and whose condition is not relieved through other means, without subsistence medical care.*" (*Hunt, supra,* 21 Cal.4th at pp. 1013, 1014, italics added.) As the high court concluded, after citing *Viloria, supra,* 276 Cal.App.2d 350 with approval, counties "may not deny subsistence medical care to residents based upon criteria unrelated to individual residents' financial ability to pay *all or part* of the actual cost of such care." (*Hunt, supra,* 21 Cal.4th at pp. 1014, 1015, italics added.)

■ The above authorities compel the conclusion that a flat-income-cap eligibility standard that does not consider an individual's ability to pay *all or a part* of his or her subsistence medical care is not permitted.

The County asserts that adoption of such a rule would require the County to "satisfy all unmet health care needs" or "provide universal health insurance." Just such an argument was rejected by the Supreme Court in *Hunt, supra*, 21 Cal.4th at page 1014: "Contrary to [Sacramento County's] assertion, recognizing such an obligation neither requires the County to satisfy all unmet needs, nor mandates universal health care. . . . The Legislature has eliminated any requirement that counties provide the same quality of health care to residents who cannot afford to pay as that available to nonindigent individuals receiving health care services in private facilities. . . . Section 10000 imposes a minimum standard of care—one requiring that subsistence medical services be provided promptly and humanely." (Citation omitted.) As stated above, "section 17000 requires provision of medical services to the poor at a level which does not lead to unnecessary suffering or endanger life and health . . . ." (*Tailfeather, supra*, 48 Cal.App.4th at p. 1240.) Thus, section 17000 is designed to allow only necessary treatment for serious illness and injury, as the plaintiffs in this case have suffered. They are seeking treatment for such serious ailments as diabetes, serious lung infections, thyroid disease, high blood pressure, and malignant melanoma. They are not asking that *all* of the medical care of indigents, including the routine care enjoyed by nonindigents, be paid for by the County.

Nor is there a danger that the County would be forced to treat those who are not truly indigent. Section 17000 only allows benefits to indigents "when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions." A County resident who can afford and has private health insurance that covers his or her subsistence care would not qualify.

Further, section 17107 permits counties to set limits on "the amount of property, if any, a person shall be permitted to have" in order to receive benefits. CMS has set a limit of $2,000 in property for its recipients of medical care. This small property ownership limit will undoubtedly limit CMS services to only truly indigent individuals.

The County also contends that its income cap is appropriate because it may adopt its own definition of indigence, as opposed to performing an individual needs assessment. This contention is unavailing.

The California Supreme Court rejected *Bay General, supra*, 156 Cal.App.3d 944, which held that the County did not have to pay for the health care of "the working poor, i.e., those individuals who are above Medi-Cal cut off limits but cannot pay for their own medical care . . . ." (*Id* at p. 959.) The *Bay General* court had concluded that counties only needed to provide care to "indigents as defined within its board of supervisors' sound discretion." (*Id.* at

p. 960.) The California Supreme Court, in *County of San Diego, supra*, 15 Cal.4th at page 101, footnote 23, disapproved this holding, insofar as it "states that a county's responsibility under section 17000 extends only to indigents as defined by the county's board of supervisors . . . ."

■ Rather, the California Supreme Court itself defined medically indigent persons: "Historically, individuals eligible for medical care under section 17000, but not under other specialized aid programs, have been persons with insufficient means to pay for subsistence medical care." (*Hunt, supra*, 21 Cal.4th at p. 1013.) Similarly, in *County of San Diego, supra*, 15 Cal.4th at pages 102–103, the high court cited with approval the definition given in *Goodall, supra*, 11 Cal.App.2d at page 550: "[F]or purposes of a county's duty to provide 'indigent persons' with hospitalization, . . . [this] include[s] a person 'who has insufficient means to pay for his maintenance in a private hospital after providing for those who legally claim his support.' [Citation.]"

Further, the County's discretion in determining eligibility is constrained to the extent that it must "carry out" the objectives of section 17000. (*Mooney, supra*, 4 Cal.3d at p. 679.) County standards that fail to carry out section 17000's objectives "are void and no protestations that they are merely an exercise of administrative discretion can sanctify them." (*Morris v. Williams, supra*, 67 Cal.2d at p. 737.) The guiding purpose of sections 10000 and 17000 is to provide subsistence medical care to " '*all* of [the State's] needy and distressed.' " (*County of San Diego, supra*, 15 Cal.4th at pp. 100–101.) Moreover, section 10000 requires that aid be administered so as to " 'encourage self-respect, self-reliance, and the desire to be a good citizen, useful to society.' " (See *Robbins v. Superior Court* (1985) 38 Cal.3d 199, 208, 222 [211 Cal.Rptr. 398, 695 P.2d 695], italics omitted.) It defeats the goals of sections 10000 and 17000 if members of the working poor, whose income is even $1 over the County's eligibility cap, but cannot afford medical care, receive no care from CMS for serious medical conditions, while those that are not working would receive assistance. Their only option under the County's eligibility standard is to allow their conditions to worsen to such an extent that they can no longer work, and then qualify for CMS or other aid. "This would amount to the penalizing of honest industry, thrift, and independence . . . ." (*Goodall, supra*, 11 Cal.App.2d at p. 549.) On the other hand, allowing CMS care for the working poor who can pay for some, but not all treatment for their serious illness or injury, "promotes the public health and general welfare of the community in which [they live]." (*Ibid.*)

As for the County's assertion that plaintiffs are seeking a requirement that it perform an individual needs assessment, that is not the case. It is true that "the county is not constrained to make an individual needs assessment for each recipient." (*Poverty Resistance Center v. Hart, supra*, 213 Cal.App.3d at

p. 308.) The County may properly rely on statistics, surveys and calculations to come up with an income eligibility standard. However, at its root, the eligibility standard must "take into account the financial ability of residents to obtain subsistence medical care." (*Hunt, supra*, 21 Cal.4th at p. 1012.) The average monthly cost of housing, transportation, food, and, medical, is just that, an average. For those indigents suffering from serious illness or injury, such as the class represented in this action, medical costs may be enormous. Insurance may be unavailable or out of their financial reach. The eligibility standard must take into account that there will be indigents, such as the class represented in this action, who in fact have limited or no ability to pay for their treatment for serious illness and injury and cannot obtain insurance. In fact, this population is the very group that section 17000 was designed to protect. CMS cannot be considered a "safety net" or place of "last resort" for subsistence medical care if it does not allow medical care at all for those suffering from serious injury or illness, but whose income is $1 over the income cap set by the County and who cannot afford or cannot obtain insurance.

Nor are the plaintiffs, as the County contends, seeking to *mandate* a share of cost program for those whose income exceeds the cap set by the County. That is simply one alternative.[5] As the plaintiffs point out, there are several alternative methods of providing care to those with a limited ability to pay. The County could institute a sliding scale fee system, in which health care services are priced based upon ability to pay. It could enact an income limit for free care, supplemented by provisions permitting those over the limit to apply for medical and financial hardship exceptions. The County could set an income cap that is sufficiently high that those exceeding the limit will have the means to obtain health care. Because of the discretion vested in the County to select standards for subsistence medical care to indigents under section 17000, this court will not mandate a particular vehicle to achieve that result. However, counties "have no discretion to refuse to provide medical care to 'indigent persons' within the meaning of section 17000 who do not receive it from other sources." (*County of San Diego, supra*, 15 Cal.4th at p. 101.) Because the current income cap results in a denial of subsistence medical care to such individuals, it is void. (*Morris v. Williams, supra*, 67 Cal.2d at p. 737.)

---

[5] The County uses several pages of its brief to argue that plaintiffs are estopped from asserting on appeal that the eligibility standard must include a cost-sharing mechanism because they abandoned that position at the trial court level. However, the County simply misapprehends the plaintiffs' position, which is that such a mechanism is but one alternative that would satisfy the mandate of section 17000.

## DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings not inconsistent with this opinion. Costs on appeal to appellants.

Haller, J., and O'Rourke, J., concurred.

Respondents' petition for review by the Supreme Court was denied August 22, 2007, S154034.